14-4116-cv
*Figueroa v. Mazza et al.*

# In the

# United States Court of Appeals

## For the Second Circuit

————

AUGUST TERM 2015
No. 14-4116-cv

ELI SAMUEL FIGUEROA, A/K/A ELI SAMUEL,
*Plaintiff-Appellant,*

*v.*

DONNA MARIE MAZZA, INDIVIDUALLY AND AS A DETECTIVE WITH THE
NEW YORK CITY POLICE DEPARTMENT, CHRISTOPHER KAROLKOWSKI,
INDIVIDUALLY AND AS A DETECTIVE WITH THE NEW YORK CITY POLICE
DEPARTMENT, TODD NAGROWSKI, INDIVIDUALLY AND AS A DETECTIVE
WITH THE NEW YORK CITY POLICE DEPARTMENT, JOSEPH FAILLA,
INDIVIDUALLY AND AS A DETECTIVE WITH THE NEW YORK CITY POLICE
DEPARTMENT, AND DETECTIVE DENNIS CHAN, INDIVIDUALLY AND AS A
DETECTIVE WITH THE NEW YORK CITY POLICE DEPARTMENT,
*Defendants-Appellees.*\*

————

Appeal from the United States District Court
for the Eastern District of New York

————

---

\* The Clerk of Court is directed to amend the official caption to conform
with the caption above.

ARGUED: OCTOBER 22, 2015
DECIDED: JUNE 3, 2016
AMENDED: JUNE 3, 2016

_____

Before: KEARSE, WALKER, and CABRANES, *Circuit Judges*.

_____

We consider here whether defendants-appellees are, as the District Court determined, entitled to judgment as a matter of law on plaintiff-appellant's claims for false arrest, excessive force, assault, failure to intervene, and unlawful entry. We conclude that defendants-appellees are entitled to the protection of qualified immunity with respect to the false arrest claims and that they did not use excessive force or commit an assault in arresting plaintiff-appellant. We also conclude, however, that the claims of failure to intervene and unlawful entry present issues of fact that must be resolved by a jury.

Plaintiff-appellant Eli Samuel Figueroa appeals a September 30, 2014 judgment of the United States District Court for the Eastern District of New York (Jack B. Weinstein, *Judge*) entering judgment as a matter of law in favor of defendants-appellees Donna Marie Mazza, Christopher Karolkowski, Todd Nagrowski, Joseph Failla, and Dennis Chan, each a detective with the New York City Police Department.

In the proceeding below, plaintiff asserted claims under 42 U.S.C. § 1983 and state law for false arrest, excessive force, assault, failure to intervene, and unlawful entry, all arising out of his arrest

on June 30, 2010. The District Court granted summary judgment as to the claims of unlawful entry. The other claims were tried to a jury. Following a verdict in plaintiff's favor on the counts of false arrest, excessive force, and assault, and a mistrial on the count of failure to intervene, the District Court granted judgment to defendants under Federal Rule of Civil Procedure 50(b). Plaintiff appeals the judgment as to each claim and further asserts that the District Court "abused its discretion" in dismissing unnamed defendants from the case and closing discovery.

We agree with the District Court's disposition of plaintiff's false arrest claims. The trial record establishes that a reasonable law enforcement officer could have concluded that there existed probable cause to arrest plaintiff on the evening of June 30, 2010; accordingly, defendants can claim the protection of qualified immunity. We also conclude, as did the District Court, that the force used in effecting plaintiff's arrest was reasonable as a matter of law, and we find no error in the District Court's dismissal of unnamed defendants or discovery rulings. We thus **AFFIRM** the judgment insofar as it disposed of plaintiff's claims for false arrest, excessive force, and assault, dismissed unnamed defendants, and refused to permit further discovery.

We do not agree, however, with the District Court's disposition of plaintiff's claims for failure to intervene and unlawful entry. The District Court erred in concluding, as a matter of law, that defendants had no realistic opportunity to intervene in an alleged assault on plaintiff by an unidentified police officer and that

3

plaintiff lacked a legitimate expectation of privacy in his mother's apartment. Accordingly, we **VACATE** so much of the judgment as rejected plaintiff's failure-to-intervene and unlawful-entry claims as a matter of law and **REMAND** for such further pretrial proceedings as may be appropriate in the circumstances, or for trial.

Judge KEARSE concurs in part and dissents in part in a separate opinion.

————

ROBERT MILTON RAMBADADT (Rosa Barreca, *on the brief*), The Rambadadt Law Office, New York, NY, *for Plaintiff-Appellant*.

ELIZABETH S. NATRELLA (Pamela Seider Dolgow, *on the brief*), *for* Zachary W. Carter, Corporation Counsel of the City of New York, New York, NY, *for Defendants-Appellees.*

————

JOSÉ A. CABRANES, *Circuit Judge*:

We consider here whether defendants-appellees are, as the District Court determined, entitled to judgment as a matter of law on plaintiff-appellant's claims for false arrest, excessive force, assault, failure to intervene, and unlawful entry. We conclude that defendants-appellees are entitled to the protection of qualified immunity with respect to the false arrest claims and that they did not use excessive force or commit an assault in arresting plaintiff-

4

appellant.  We also conclude, however, that the claims of failure to intervene and unlawful entry present issues of fact that must be resolved by a jury.

Plaintiff-appellant Eli Samuel Figueroa ("Samuel") appeals a September 30, 2014 judgment of the United States District Court for the Eastern District of New York (Jack B. Weinstein, *Judge*) entering judgment as a matter of law in favor of defendants-appellees Donna Marie Mazza ("Mazza"), Christopher Karolkowski ("Karolkowski"), Todd Nagrowski ("Nagrowski"), Joseph Failla ("Failla"), and Dennis Chan ("Chan") (jointly, "defendants"), each a detective with the New York City Police Department.

In the proceeding below, Samuel asserted claims under 42 U.S.C. § 1983 and state law for false arrest, excessive force, assault, failure to intervene, and unlawful entry, all arising out of his arrest on June 30, 2010.  The District Court granted summary judgment as to the claims of unlawful entry.  The other claims were tried to a jury.  Following a verdict in Samuel's favor on the counts of false arrest, excessive force, and assault, and a mistrial on the count of failure to intervene, the District Court granted judgment to defendants under Federal Rule of Civil Procedure 50(b).  Samuel appeals the judgment as to each claim and further asserts that the District Court "abused its discretion" in dismissing unnamed defendants from the case and closing discovery.

We agree with the District Court's disposition of Samuel's false arrest claims.  The trial record establishes that a reasonable law

enforcement officer could have concluded that there existed probable cause to arrest Samuel on the evening of June 30, 2010; accordingly, defendants can claim the protection of qualified immunity. We also conclude, as did the District Court, that the force used in effecting Samuel's arrest was reasonable as a matter of law, and we find no error in the District Court's dismissal of unnamed defendants or discovery rulings. We thus **AFFIRM** the judgment insofar as it disposed of Samuel's claims for false arrest, excessive force, and assault, dismissed unnamed defendants, and refused to permit further discovery.

We do not agree, however, with the District Court's disposition of Samuel's claims for failure to intervene and unlawful entry. The District Court erred in concluding, as a matter of law, that defendants had no realistic opportunity to intervene in an alleged assault on Samuel by an unidentified police officer and that Samuel lacked a legitimate expectation of privacy in his mother's apartment. Accordingly, we **VACATE** so much of the judgment as granted judgment to defendants on Samuel's failure-to-intervene and unlawful-entry claims and **REMAND** for such further pretrial proceedings as may be appropriate in the circumstances, or for trial.

# BACKGROUND

## I. The Facts[1]

On June 29, 2010, a Duane Reade pharmacy in Brooklyn received eleven phone calls from an unidentified woman. App. 222, 679-81; SPA 8.[2] The calls, which were fielded by an employee named Esteban Arias, concerned an order for photographs that had been placed at the pharmacy. App. 222, 230-33. The caller "plead[ed]" that Arias locate the order in Duane Reade's system and delete it without developing the photos. App. 222.

Arias tracked down the photos, which apparently had already been developed. He intended to throw them away, as the caller had directed, but hesitated when he discerned their subject matter. App. 232. The photos appeared to have been taken in a public restroom. They depicted a young boy, perhaps two years old, naked and apparently distressed. Some showed close-up images of the boy's genitals and anus. App. 124-30, 222, 1040-57. In each, a date-stamped money order and a copy of the June 25, 2010 *New York Daily News* appeared in the background. App. 124-25, 222.

Arias called the police. Officers responded and viewed the photos themselves. Some, noting the presence of the date-stamped

---

[1] We view the facts in the light most favorable to Samuel. *See Runner v. N.Y. Stock Exch., Inc.*, 568 F.3d 383, 386 (2d Cir. 2009).

[2] References to "App." are to plaintiff-appellant's appendix. References to "SPA" are to the special appendix.

money order and newspaper, suspected that they were so-called "proof-of-life" photos—that is, photos taken to establish that a missing child is still alive, with the aim of securing a ransom. App. 510. Others thought that the photos might be related to sex trafficking, App. 261, or child pornography, App. 222. Concluding that "urgent[ ]" action was needed to locate the child and ensure his safety, App. 260-61, 275, a number of officers (including the five named defendants) from numerous divisions began investigating. By the next day police had viewed security footage from the pharmacy showing that a young woman had ordered the photos on June 26, 2010.[3] App. 244-45.

In the meantime, other officers tried to determine who owned the phone that had been used to call the pharmacy. They learned that on June 28, 2010, a complaint had been lodged with the department under the same phone number. App. 271, 303, 620. The complainant had identified himself as "Eli Samuel."

Samuel had filed the complaint on behalf of a woman named Shirley Saenz ("Saenz") on the ground that Saenz had recently reported to the police suspected child abuse, but her claim had not been taken seriously. App. 595-96. More particularly, Saenz had told police that she thought her son's father was abusing the boy during weekend visits. App. 105, 111-12. Suspecting abuse, she had documented her son's pre-visitation physical condition by taking

---

[3] Police had also ascertained that the photos had been taken in the restroom of a McDonald's restaurant. App. 264-65.

8

photos of him while he was unclothed.[4]  App. 104.  But the police had been of little help, prompting Samuel—a rabbi and spiritual advisor who was providing financial aid and guidance to Saenz, App. 102-03, 536-40—to complain.  Samuel's complaint also accused Saenz's mother, Beatrice Saenz ("Beatrice"), of harassment.[5]  App. 304, 596.

Although this information might have suggested that the Duane Reade photos had not been taken for a nefarious purpose, police continued to investigate the case as a potential kidnapping. App. 416.  Detective Nagrowski used the information in Samuel's complaint to locate Beatrice.[6]  Along with six members of the Brooklyn South Homicide Task Force (the "Task Force"), he interviewed her at her residence around 8:00 p.m. on June 30, 2010. App. 270-71, 311.  Beatrice told Nagrowski that Saenz was her daughter and, having been shown the photos from Duane Reade,

---

[4] In April 2010, a judge of the Kings County Family Court, having learned that Saenz was taking explicit photographs of her son for this purpose, had directed that she stop the practice lest she be "prosecuted for child pornography" and lose custody of the child.  App. 150-54.  But this was not known to the officers at the time of Samuel's arrest and was not relied on by the District Court in ruling on defendants' Rule 50 motion. *Figueroa v. Mazza*, 59 F. Supp. 3d 481, 491 (E.D.N.Y. 2014).

[5] With one exception, discussed below in note 6, defendants do not contest that all relevant officers had knowledge of Samuel's complaint and Saenz's report at all relevant times. *See* Defs.' Br. 33.

[6] Though defendants suggest otherwise, *see* Defs.' Br. 15; App. 309, it appears that, at the time Nagrowski interviewed Beatrice, he was aware that Samuel had lodged a complaint against her, *see* App. 998.

that the child was her grandson. App. 272-74. She went on to say that she had recently kicked Saenz out of her home and that Saenz had joined a cult led by someone named "Eli Samuel." App. 274. According to Beatrice, she had noticed one day that her daughter had sustained a number of bruises. Confronted about her injuries, Saenz had said that Samuel had inflicted them while exorcising demons from her. *Id.* Beatrice also informed Nagrowski that she and Saenz were engaged in a legal battle for visitation rights concerning her grandson, App. 307, and that Saenz was currently living with a friend named Isabel Romero, App. 311-12.

Nagrowski and the other officers proceeded to Romero's apartment. There they found Romero, who told them that Saenz and her child had been in the apartment that morning; at the time, however, she did not know where they were. App. 280, 999.

While Nagrowski and the members of the Task Force were interviewing Beatrice and Romero, other officers were trying to locate Samuel. They tracked the location of his phone to an apartment in Manhattan (which turned out to be Samuel's mother's). App. 417, 619. Officers headed to the apartment around 10:00 p.m. At the same time—having not yet discounted the possibility that Saenz's child had been kidnapped—a hostage negotiator called Samuel's phone. App. 416-18, 620-22.

Samuel answered, and the negotiator asked him about the complaint he had filed with the department. Samuel stated, as he had in the complaint, that Saenz's child was being abused and the

10

police were failing to appropriately respond. App. 621. The negotiator told Samuel that Saenz and her child had been kidnapped and asked him to come to the 72nd Precinct; Samuel responded that they had not been kidnapped and that he would not come to the precinct willingly. He then hung up. App. 621-24.

A short time later, officers knocked on the door of Samuel's mother's apartment. According to Samuel, his mother opened the door a foot or two; Samuel, seeing Detectives Karolkowski and Failla, stepped in front of her and tried to shut it, but Karolkowski forced it open. App. 627-28. According to defendants, Samuel invited them in. App. 428.

Karolkowski and Failla, along with Detective Mazza, entered the apartment, and Karolkowski and Failla approached Samuel. App. 629. Karolkowski "gripped" Samuel's shoulder. *Id.* Without placing him in handcuffs, officers led Samuel out of the apartment and down a flight of stairs to the street. App. 636. Samuel did not fight back, but by his own admission he "resist[ed]," App. 640, by stiffening his legs as the officers "pushed" him along, App. 633. This use of light force caused Samuel no injury. App. 726.

Once outside, the officers placed Samuel in the backseat of an unmarked police car. Failla and Detective Chan were sitting in front. App. 640-41. According to Samuel's trial testimony, an unidentified officer suddenly opened the cruiser's back door, grabbed Samuel, and punched him a number of times. App. 643-44. Samuel reenacted this event during trial. Based on his

11

demonstration, Judge Weinstein stated on the record that the assault lasted between ten and twenty seconds, nearer to ten than twenty. App. 931. But another witness testified that the assault lasted at least one minute and as many as two. App. 562. Neither Failla nor Chan, sitting in front, tried to intercede. App. 643-44.

Shortly after Samuel's arrest, police located the child in the Duane Reade photos. He had not been kidnapped or, indeed, harmed at all; he had been with his mother. The two were found safe late at night on June 30, 2010. App. 505-06. The lone charge against Samuel—endangering the welfare of a child, in violation of N.Y. Penal Law § 260.10—was eventually dropped. *Figueroa v. Mazza*, 59 F. Supp. 3d 481, 485 (E.D.N.Y. 2014); Pl.'s Br. 19.

## II. The District Court Proceeding

Samuel filed suit against the City of New York and a number of individual officers, bringing claims under 42 U.S.C. § 1983 and New York law for Fourth Amendment and state-law violations.[7] As

---

[7] Title 42 of the United States Code, section 1983, creates a private right of action for damages against a person who, acting under color of state law, deprives another of a right secured by the laws of the United States. *Rehberg v. Paulk*, 132 S. Ct. 1497, 1501 (2012). It provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party

relevant here, he sought relief on four theories: that (1) Mazza, Nagrowski, Karolkowski, Failla, and Chan arrested him without probable cause; (2) Karolkowski and Failla used excessive force (and committed an assault under state law) while arresting him; (3) Failla and Chan failed to intervene when an unidentified officer assaulted him following his arrest; and (4) Mazza, Karolkowski, Failla, and Chan unlawfully entered his mother's apartment without a warrant. *See Figueroa*, 59 F. Supp. 3d at 485; Third Am. Compl. at 22-25, Figueroa v. Mazza, No. 11 Civ. 3160 (JBW) (E.D.N.Y. Apr. 25, 2014), ECF No. 107.

Defendants moved for summary judgment. *See* Mem. Supp. Mot. Summ. J., Figueroa v. Mazza, No. 11 Civ. 3160 (JBW) (E.D.N.Y. July 31, 2014), ECF No. 146. The District Court granted their motions as to the § 1983 unlawful-entry claims on the ground that Samuel did not reside in his mother's apartment and consequently lacked a reasonable expectation of privacy in the property. Tr. Oral Ruling at 9, Figueroa v. Mazza, No. 11 Civ. 3160 (JBW) (E.D.N.Y. Aug. 21, 2014), ECF No. 220. The remaining claims were tried to a jury, which returned verdicts against all defendants on the § 1983 false arrest claims and against Karolkowski and Failla on the § 1983 excessive force and state-law assault claims. *Figueroa*, 59 F. Supp. 3d at 487. The jury failed to reach a verdict on the § 1983 failure-to-

---

injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

intervene claims against Failla and Chan, and a mistrial was declared with respect to those claims only. *Id.*

Following the verdict, defendants moved for relief under Federal Rule of Civil Procedure 50(b). Concluding that the evidence submitted to the jury was insufficient to support a verdict as to any of the claims, including the failure-to-intervene claims on which the jury could not reach a verdict, the District Court granted defendants' motions and entered judgment in their favor.

### III. Samuel's Appeal

Samuel timely appealed the District Court's September 30, 2014 judgment. He contends that the District Court erred in entering judgment as a matter of law in favor of defendants on his claims for (1) false arrest, (2) excessive force and assault, (3) failure to intervene, and (4) unlawful entry. He also challenges a May 1, 2014 order of the District Court denying his request for further discovery.

We find no error in the District Court's decision to deny Samuel further discovery, and we agree with the District Court that defendants were entitled to judgment as a matter of law on Samuel's false arrest, excessive force, and assault claims. We conclude, however, that the District Court erred in (1) granting summary judgment in defendants' favor on Samuel's unlawful-entry claims, and (2) granting Rule 50(b) relief in defendants' favor on Samuel's failure-to-intervene claims. As to these claims, we vacate the judgment and remand for further proceedings.

14

## DISCUSSION

We review *de novo* both the District Court's grant of summary judgment and its grant of relief under Rule 50(b), "construing all facts in favor of the nonmoving party." *Runner v. N.Y. Stock Exch., Inc.*, 568 F.3d 383, 386 (2d Cir. 2009). Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of influencing the case's outcome under governing substantive law, and a "genuine" dispute is one as to which the evidence would permit a reasonable juror to find for the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The standard for post-verdict judgment as a matter of law is the same as for summary judgment under Fed. R. Civ. P. 56."[8]

---

[8] We pause to note that, although the standard applied is the same in each case, Rule 50 motions and summary-judgment motions are decided on different evidentiary records. Because "summary judgment motions are usually made before trial," they are "decided on documentary evidence." *Anderson*, 477 U.S. at 251 (internal quotation marks omitted). It follows from the purpose of the summary-judgment device—to determine whether there exists a genuine issue of material fact for trial—that any evidence considered on summary judgment must be reducible to admissible form. *See* Fed. R. Civ. P. 56(c)(2); *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001). By examining such documentary evidence as could be admitted at trial, a court adjudicating a summary-judgment motion determines whether any reasonable juror could, if presented with that evidence at trial, find for the nonmovant.

The Rule 50 inquiry differs. Because "[Rule 50] motions are made at trial," they are decided not on what evidence *could have been* admitted, but on "the evidence that *has been* admitted." *Anderson*, 477 U.S. at 251 (emphasis supplied) (internal quotation marks omitted); *see Rothstein v. Carriere*, 373 F.3d

*Runner*, 568 F.3d at 386 (internal quotation marks omitted); *see* Fed. R. Civ. P. 50(a)-(b).

The District Court's discovery order is reviewed with a lighter touch. District courts have "wide latitude to determine the scope of discovery"; a discovery ruling will warrant relief on appeal only if it constitutes an "abuse of discretion." *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 103 (2d Cir. 2008).

## I. False Arrest

The District Court granted Rule 50(b) relief on Samuel's false arrest claims on the ground that defendants had probable cause to

---

275, 284 (2d Cir. 2004) ("[O]nce a trial has occurred, the focus is on the evidence that was actually admitted at trial, not on the earlier summary judgment record."). What we care about at the Rule 50 stage is not whether the nonmovant has managed to collect evidence sufficient to support his cause, but whether he has actually put that evidence before the jury charged with deciding the dispute. Evidence kept hidden under a bushel, never brought out to enlighten the factfinder, does not figure in the calculus.

For that reason, we are unable to endorse our dissenting colleague's view that "[the record that] should properly be considered on the issue of arguable probable cause [as to Samuel's false arrest claims] . . . includes all relevant evidence in the district court's record, not just the evidence admitted at trial." Dissenting Op. at 2. Samuel brought his false arrest claims to trial and, at trial, offered evidence to support them. In considering defendants' Rule 50 motion as to those claims, the District Court properly confined its review to the trial record, *see Figueroa*, 59 F. Supp. 3d at 486-87, and we must do the same in considering the claims on appeal. Accordingly, our analysis of Samuel's false arrest claims does not take account of evidence—such as a series of written reports from a Detective Hawkins concerning Saenz's mid-June complaint to police—that was never put before the jury, but on which our dissenting colleague thinks it appropriate to rely. *See* Dissenting Op. at 3.

16

arrest him. We need not determine whether probable cause was indeed present. *See Sudler v. City of New York*, 689 F.3d 159, 168 (2d Cir. 2012) ("We may affirm on any ground supported by the record."). Even if it was not, defendants are entitled to judgment as a matter of law on the basis of qualified immunity because, in light of the facts known to police at the time of Samuel's arrest, an officer "of reasonable competence" could have concluded that the arrest was justified by probable cause. *See Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The existence of probable cause to arrest—even for a crime other than the one identified by the arresting officer—will defeat a claim of false arrest under the Fourth Amendment. *Devenpeck v. Alford*, 543 U.S. 146, 152-54 (2004). "Probable cause to arrest exists when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks omitted). Probable cause is a "fluid" standard that "does not demand hard certainties or mechanistic inquiries"; nor does it "demand that an officer's good-faith belief that a suspect has committed or is committing a crime be correct or more likely true than false." *Zalaski v. City of Hartford*, 723 F.3d 382, 389, 390 (2d Cir. 2013) (citations and internal quotation marks omitted). Rather, it requires only facts establishing "the kind of fair probability" on which a "reasonable and prudent" person, as opposed to a "legal technician[ ]," would

17

rely. *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013) (internal quotation marks omitted).

Even if we determine that an officer made an arrest without probable cause, our inquiry concerning that officer's individual liability is not at an end. The defense of qualified immunity "shields law enforcement officers from § 1983 claims for money damages provided that their conduct does not violate clearly established constitutional rights of which a reasonable person would have been aware." *Zalaski*, 723 F.3d at 388. The doctrine aims to give officials room to act with confidence in gray areas by absolving from personal liability "all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Malley*, 475 U.S. at 341).

In the context of § 1983 actions predicated on allegations of false arrest, we have held that an arresting officer is entitled to qualified immunity so long as "arguable probable cause" was present when the arrest was made. *Zalaski*, 723 F.3d at 390 (internal quotation marks omitted). A police officer has arguable probable cause "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Id.* (internal quotation marks omitted). Put another way, an arresting officer will find protection under the defense of qualified immunity unless "no reasonably competent officer" could have concluded, based on the facts known at the time of arrest, that probable cause existed. *See Malley*, 475 U.S. at 341.

This point merits emphasis. When a plaintiff alleges that a law enforcement officer's official conduct renders him personally liable in damages, our inquiry is not whether the officer *should have* acted as he did. Nor is it whether a singular, hypothetical entity exemplifying the "reasonable officer"—a creature akin to the "reasonable man" of the law of torts, *see* Restatement (Second) of Torts § 283 cmt. c (Am. Law Inst. 1975)—*would have* acted in the same way. It is instead whether *any* reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, *could have* determined that the challenged action was lawful. *See Malley*, 475 U.S. at 341; *compare Walczyk v. Rio*, 496 F.3d 139, 154 n.16 (2d Cir. 2007), *with id.* at 169-70 (Sotomayor, J., concurring).

Applying this standard, we hold that defendants are entitled to qualified immunity on Samuel's claims of false arrest. We address, first, why it was reasonable for the arresting officers to have concluded that a crime had been committed; and, second, why it was reasonable for them to have concluded that Samuel committed it.

**A. Defendants' Belief that a Crime Had Been Committed**

Samuel does not appear to contest—and at all events, we have no trouble concluding—that, early in their investigation, defendants developed evidence sufficient to warrant a reasonable officer in the belief that the child in the Duane Reade photos had been the victim of a crime. Karolkowski testified that he had believed the pictures to

19

be proof-of-life photos—that is, photos taken to establish that a kidnapped person is still alive and can be saved through payment of a ransom. *See* App. 510. Absent some competing explanation for the presence of the newspaper and date-stamped money order—and taking into account the photos' disturbing content—the officers had probable cause to believe that the boy had been kidnapped. We do not understand Samuel to argue otherwise.

Other officers, in the early going, formed the conclusion that the Duane Reade photos were examples of child pornography. *See* App. 222-23. That view was also justified. Though Samuel does not appear to argue to the contrary, we pause to explain why.

Under New York law in effect at the time of the arrest, a person would commit the offense of "promoting a sexual performance by a child" if, "knowing the character and content thereof, he produces, directs or promotes any performance which includes sexual conduct by a child less than seventeen years of age," N.Y. Penal Law § 263.15 (McKinney 2001); a person would commit the offense of "possessing a sexual performance by a child" if, "knowing the character and content thereof, he knowingly has in his possession or control any performance which includes sexual conduct by a child less than sixteen years of age," *id.* § 263.16 (McKinney 1996). As used in each statute, the term "performance" includes photographs, *id.* § 263.00(4) (McKinney 2003), and the term "sexual conduct" includes "lewd exhibition of the genitals," *id.* § 263.00(3). The statute does not define "lewd exhibition of the genitals," but the New York courts have used a six-factor test to

20

determine whether a given exhibition qualifies as "lewd":

> (1) whether the focal point of the visual depiction is on the child's genitalia or pubic area;
>
> (2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or a pose generally associated with sexual activity;
>
> (3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;
>
> (4) whether the child is fully or partially clothed, or nude;
>
> (5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; [and]
>
> (6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

*People v. Horner*, 752 N.Y.S.2d 147, 149-50 (3d Dep't 2002) (quoting *United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986), *aff'd sub nom. United States v. Wiegand*, 812 F.2d 1239 (9th Cir. 1987)).  Not all of the elements described in the foregoing factors need be present for a depiction to qualify.  *Id.* at 150.  A court must consider "the combined effect of the setting, attire, pose and emphasis on the genitals and whether it is designed to elicit a sexual response in the viewer, albeit perhaps not the average viewer, but perhaps in the pedophile viewer."  *Id.* (internal quotation marks omitted).

Applying this standard to the Duane Reade photos, we conclude that the officers who viewed them at the outset of the

21

investigation had probable cause to believe that they constituted child pornography (or, in the language of the New York statute, a "sexual performance by a child"). In a number of the photos, the child's genitals are the primary object of focus; indeed, some photos show nothing else save the child's lower torso and upper thighs. *See, e.g.*, App. 1039, 1047; *cf. United States v. Rivera*, 546 F.3d 245, 249-50 (2d Cir. 2008) (applying the *Dost* factors and observing that the photographic subject was depicted with "his genitals prominent at or about the center of the frame"). In some, the child appears to be unnaturally posed and the shot taken to capture only his genitalia, perineum, and anus. *See* App. 1048-50; *cf. People v. Bimonte*, 726 N.Y.S.2d 830, 836 (N.Y. Crim. Ct. 2001). In each photo, the child is nude. The suggestion *vel non* of sexual "coyness" is, of course, inapplicable in the case of a subject so young, *see Wiegand*, 812 F.2d at 1244 ("The district court noted the unlikelihood of the 10-year-old girl intending any sexual invitation by her pose."), and though officers had no direct way to divine whether the photographer intended the photos to elicit a sexual response in the viewer, the photos' content permitted an inference of such intent.

Thus, when officers first viewed the Duane Reade photos, they were justified in concluding that the photos qualified as unlawful child pornography and that a violation of § 263.15, § 263.16, or both had been committed. Moreover, the determination that an unknown person had produced child pornography would easily have supported a reasonable conclusion that that person had committed a separate offense, that of endangering the welfare of a

22

child, by "knowingly act[ing] in a manner likely to be injurious to the physical, mental or welfare of" the boy in the photographs. N.Y. Penal Law § 260.10(1); *see People v. Pinkoski*, 752 N.Y.S.2d 421, 425 (3d Dep't 2002).

Samuel's principal argument is that, irrespective of what defendants might reasonably have thought at the beginning of their investigation, they had, by the time of his arrest, uncovered new information that vitiated probable cause. More particularly, Samuel argues that when the officers learned from Isabel Romero that Saenz and her child had been together at Romero's apartment on the morning of June 30, it fatally undermined the hypothesis that the child had been kidnapped (and proof-of-life photos taken) days earlier. He also argues that, when officers came to realize that Saenz had taken similar photos in the past for the avowed purpose of demonstrating that the child's father was abusing him, it should have negated any reasonable belief that the images were pornographic. *See* Pl.'s Br. 26-27.

Samuel is correct in noting that an officer making a probable-cause determination is not at liberty to ignore evidence tending to exculpate the suspect, *see Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006), and that the officers were accordingly not entitled to disregard the information from Romero or their knowledge of Saenz's earlier photos. But we nevertheless conclude that, even after learning that Saenz had recently told police that she took nude photos of her son to show that the boy's father was abusing him, officers of reasonable competence could have (1) disbelieved Saenz's

23

explanation and concluded that there was probable cause to think that the photos constituted child pornography, or (2) accepted Saenz's explanation but nevertheless concluded that those responsible for the photos had endangered the welfare of a child.[9]

We turn first to whether the officers who arrested Samuel could reasonably have doubted the truth of Saenz's description of the photos' purpose. Her explanation plainly bears to some degree on the reasonableness of the conclusion that the photos were pornographic in nature. The question is whether that explanation so thoroughly and reliably accounted for the officers' earlier suspicions that it negated any reasonable belief that probable cause existed.

We conclude that it did not. Probable cause does not necessarily disappear simply because "an innocent explanation may be consistent with" facts that an officer views as suspicious.[10] *Panetta*, 460 F.3d at 395. The officers were not required to accept Saenz's account on faith. Rather, they were entitled to weigh her explanation (along with its context: that Saenz included it in a report to police doubtless lent it some credibility) against the facts on the other side of the ledger.

---

[9] In light of these conclusions, we need not determine whether a reasonable officer could have determined that, notwithstanding Romero's statement that she had seen Saenz and her child on June 30, 2010, there was probable cause to believe that the boy had been kidnapped.

[10] We discuss below whether Saenz's explanation was indeed "innocent" or must necessarily have been viewed as such by a reasonable officer.

24

Those facts were unsettling. As discussed above, the photos, considered by themselves, appeared to be examples of child pornography. A person had called Duane Reade—eleven times— "pleading" that the photographic order be deleted and the photos not developed. SPA 8. From this, a police officer could have inferred that the caller was desperate to ensure that nobody viewed the photos—an inference consistent with the hypothesis that they were contraband.

Of course, such agitation might also have resulted from Saenz's fear that the explicit photos of her son would not remain private, and to that extent her calls to the pharmacy arguably comported with her explanation of the photos' purpose. But other facts known to the officers did not. An officer might have questioned, for instance, why a person legitimately concerned with the child's welfare would have forced him to submit to a series of elaborately staged nude photos when the child was obviously in some distress. *See* App. 1036-57. So too might an officer have asked why a person looking after the child's interests would have stripped him naked in the restroom of a McDonald's, of all places, to participate in the photo session. *See* App. 264-65. Indeed, an officer might well have hesitated to believe that a concerned mother would have delivered such explicit photos of her child to be developed at a pharmacy, where they were likely to be viewed by third parties during processing. All in all, the photos of the child were so disturbing, and the circumstances so bizarre, that it cannot be said that *no* reasonable officer could have rejected Saenz's explanation

notwithstanding its arguable consistency with the known facts.

Furthermore, even if defendants had been constrained to accept Saenz's account of the photos' purpose—and thus could not have concluded that they constituted child pornography[11]—a reasonable officer could nonetheless have determined that those responsible for the photos had endangered the child's welfare in violation of § 260.10(1). Viewed without knowledge of the circumstances surrounding their creation, the photos appear to be examples of child pornography. Even if Saenz's subjective intent in creating the photos took them outside the ambit of New York's child pornography statutes (and any and all reasonable officers would have to so conclude), the fact remains that Saenz not only produced, but took to a pharmacy for development, photos of her child that were by all appearances pornographic.

An officer could have concluded that in so doing, Saenz (along with anyone who had aided her) created a serious risk to the child's welfare in violation of § 260.10(1)—even if she did not intend to do so, *see People v. Fernandez*, 5 N.Y.S.3d 436, 436 (1st Dep't 2015) (specific intent to cause injury is not an element of endangering the

---

[11] We will assume that if a reasonable officer were to view these photos knowing why they were produced, he would be forced to conclude that they are not pornographic, *see Horner*, 752 N.Y.S.2d at 149 (reviewing court must consider "whether the visual depiction is intended or designed to elicit a sexual response in the viewer" (internal quotation marks omitted)), and that, accordingly, an officer required to accept Saenz's explanation of the photos' provenance could not reasonably have determined that § 263.15 or § 263.16 had been violated.

welfare of a child); *People v. Vega*, 712 N.Y.S.2d 283, 286 n.3 (N.Y. Crim. Ct. 2000) (same), and even if the risk did not materialize into actual harm, *People v. Simmons*, 699 N.E.2d 417, 418 (N.Y. 1998) ("Actual harm to the child need not result for liability under [§ 260.10(1)] to attach . . . ."). It should have been clear to Saenz that Duane Reade employees would likely see the photos in the normal course of developing them and that, in taking the photos to the pharmacy, she was sharing with perfect strangers a series of images of her son that bore the objective indicia of child pornography. We cannot say that *no* reasonable officer could have concluded that these facts, viewed in the light of governing law, provided probable cause to believe that Saenz had "knowingly act[ed] in a manner likely to be injurious to the physical, mental or moral welfare of" her son. *See* N.Y. Penal Law § 260.10(1); *Pinkoski*, 752 N.Y.S.2d at 422, 425 (reversing trial court's dismissal of indictment and reinstating count of endangering the welfare of a child where the defendant took explicit photographs of her five-year-old daughter and brought them to be developed at a Wal-Mart); *cf. Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 249 (2002) (observing that the circulation of images that constitute child pornography causes continuing harm to the children portrayed).

In sum, we conclude that prior to arresting Samuel, defendants could reasonably have concluded that they possessed probable cause to believe that a crime had been committed.

27

## B. Defendants' Belief That Samuel Committed the Crime

Samuel argues that, even if defendants could reasonably have concluded that Saenz's child had been the victim of a crime, they had no basis on which to conclude that Samuel had committed it. We disagree.

At the time of Samuel's arrest, officers possessed several independent items of evidence linking him to the Duane Reade photos and the suspected crime (or crimes). First, on the morning of June 29, 2010, someone used Samuel's phone to call Duane Reade—eleven times—to request that the photos of Saenz's son be deleted. App. 222, 679-81. It is true, as the District Court noted, that defendants did not know that Samuel was present when these calls were made (although he was). *Figueroa*, 59 F. Supp. 3d at 490. But "for the purpose of qualified immunity and probable cause," we do not deny officers the benefit of "reasonable inferences [drawn] from the facts they possess at the time of a seizure." *Cerrone v. Brown*, 246 F.3d 194, 203 (2d Cir. 2001). Defendants, knowing that someone had used Samuel's phone to place a number of calls to the pharmacy, could reasonably have concluded that Samuel was in some way connected with the photos and probably had knowledge of the order the caller was attempting to cancel.

The particulars of Samuel's complaint to the police on June 28, 2010—particulars which, as he emphasizes, were known to the officers, Pl.'s Br. 14, 24-25—fortified this conclusion. Samuel had lodged the complaint on behalf of Saenz, the mother of the child in

28

the Duane Reade photos.  App. 272-74, 596.  Samuel had referred to the police report made by Saenz in which she had disclosed to officers her practice of photographing her son nude; he had also revealed his awareness that explicit photographs of the boy had been taken in the recent past.  App. 596—597.  This information strengthened the link between Samuel and the photos.

Finally, during an interview with Detective Nagrowski, Saenz's mother Beatrice confirmed the connections between Samuel, Saenz, and the child.  Beatrice told Nagrowski that Saenz was the mother of the boy in the photos and that Samuel not only knew Saenz, but was a strong source of malign influence in her life.  She claimed that Saenz had become a member of his cult, and Samuel had physically harmed her during the course of an exorcism.  App. 272-74.  To be sure, defendants were not at liberty to accept these assertions uncritically.  Beatrice was, by her own admission, involved in a custody fight with her daughter, App. 307, and Nagrowski was aware that Samuel had filed a complaint with police concerning Beatrice, App. 998.  Accordingly, Beatrice had reason to speak ill of Saenz and Samuel, and a reasonable officer might have recognized that this bore on her credibility.  But, at a minimum, Nagrowski's interview with Beatrice provided further confirmation that Samuel was closely linked with Saenz and with the child in the Duane Reade photos.

We need not decide whether this information, taken as a whole, provided probable cause to conclude that Samuel had committed the crimes discussed above by participating in the

29

creation of the photos or the attempt to have them developed. We decide only that, at the time of his arrest, reasonable police officers could have disagreed on the point. In view of Samuel's close association with Saenz, his knowledge of the explicit photos, and the repeated use of his phone in the attempt to cancel the order at Duane Reade, we cannot say that the officers who participated in his arrest were either "plainly incompetent" or "knowingly violat[ing] the law." *Mullenix*, 136 S. Ct. at 308 (quoting *Malley*, 475 U.S. at 341). Those officers are therefore entitled to the protection of qualified immunity.

## II. Excessive Force and Assault

The District Court granted Rule 50(b) relief in favor of Karolkowski and Failla on Samuel's excessive force and state-law assault claims,[12] concluding that the force applied by the officers was reasonable as a matter of law.[13] Samuel argues that the Court erred in so concluding. We disagree.

Whether the force used to effect an arrest is "reasonable" or "excessive" turns on "a careful balancing of the nature and quality

---

[12] These claims pertain to the conduct of defendants in apprehending Samuel within his mother's apartment and escorting him outside. They do not relate to the incident during which Samuel allegedly was punched while sitting in the police cruiser; the officer who is said to have perpetrated that assault has never been identified.

[13] A lawful arrest is not an assault or battery under New York law, provided the force used is reasonable. *See Cunningham v. United States*, 472 F. Supp. 2d 366, 381 (E.D.N.Y. 2007) (collecting New York cases).

30

of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted). In conducting this balancing, we look to a number of factors, including "the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 251-52 (2d Cir. 2001) (internal quotation marks omitted).

Here, defendants did nothing more than "grip[ ]" Samuel's shoulders, App. 629, and "push[ ]" him out of his mother's apartment to the waiting police car, App. 633. The officers had need to push Samuel along because he lightly resisted by stiffening his legs, App. 639-40, and their pushing caused him no injury, App. 726. There is no suggestion in the record that this application of light force was actuated by malice or a desire to cause harm. Accordingly, every factor enumerated in *Johnson* weighs against Samuel, who complains basically of the kind of *de minimis* physical contact common to virtually every custodial arrest. *See Graham*, 490 U.S. at 396 ("[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."). The District Court did not err in overriding the jury's verdict and entering judgment for defendants on these claims.

31

### III. Failure to Intervene

On Samuel's failure-to-intervene claim, on which the jury failed to reach a verdict, the District Court entered judgment for Failla and Chan. Samuel argues that this was error, and we agree.

A police officer is under a duty to intercede and prevent fellow officers from subjecting a citizen to excessive force, and may be held liable for his failure to do so if he observes the use of force and has sufficient time to act to prevent it. *O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988). Liability attaches on the theory that the officer, by failing to intervene, becomes a "tacit collaborator" in the illegality. *See id.*

The District Court concluded that, as a matter of law, defendants did not have sufficient time to intercede when an unidentified officer allegedly assaulted Samuel in the back of the police cruiser. In support, it pointed to Samuel's testimony describing the attack. On the stand, Samuel made hand gestures while stating, "boom boom boom boom boom." App. 644. The Court timed this description at roughly ten seconds (perhaps a bit longer, but at all events "well under" twenty seconds). App. 931. When an assault "take[s] place in 'less than thirty seconds,'" wrote the Court, officers who are present lack "sufficient time to intercede in order to prevent the assault." *Figueroa*, 59 F. Supp. 3d at 490 (quoting *Sash v. United States*, 674 F. Supp. 2d 531, 545 (S.D.N.Y. 2009)).

For three reasons, we conclude that this was error. First,

32

Samuel never claimed that he was reenacting the duration of the attack. He was asked to describe what happened after the officers placed him in a police car. App. 642. In construing the evidence in the light most favorable to Samuel, the District Court should not have interpreted his hand gestures as a formal demonstration or reenactment of the total time frame of the punches.

Second, although Samuel's gestures at trial apparently lasted less than twenty seconds, a separate witness present during the event testified that the assault went on for at least one minute and as many as two. *See* App. 562. Defendants do not argue that Samuel's demonstration qualifies as a judicial admission that conclusively establishes the duration of the alleged assault. *See Hoodho v. Holder*, 558 F.3d 184, 191 (2d Cir. 2009) (defining judicial admissions as "formal concessions in the pleadings in the case or stipulations by a party or counsel that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact" (quoting 2 McCormick on Evidence § 254 (6th ed. 2006))). Nor is there any basis for treating it as such. A party that admits on the witness stand a fact damaging to his case is ordinarily free to contradict that fact through the testimony of other witnesses and argue that their testimony should be believed over his own. Such an argument might cut no ice with the finder of fact, but the matter lies squarely in the jury's province. *Lee v. Smith & Wesson Corp.*, 760 F.3d 523, 528 (6th Cir. 2014) (holding that a plaintiff's testimony did not qualify as a judicial admission and observing that a party "should be able to testify honestly to his memory of what happened and still

33

have his lawyer argue that on the evidence as a whole it is more probable than not that the memory was faulty"); *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995) ("When a party testifying at trial or during a deposition admits a fact which is adverse to his claim or defense, it is generally preferable to treat that testimony as solely an evidentiary admission [rather than a conclusive judicial admission]."); *cf. Keepers, Inc. v. City of Milford*, 807 F.3d 24, 34-35 (2d Cir. 2015) (stating that deposition testimony given pursuant to Federal Rule of Civil Procedure 30(b)(6) does not "bind a corporate party irrevocably to whatever its designee happens to recollect during her testimony"). Here, in holding Samuel to his own testimony, construing that testimony unfavorably, and disregarding more favorable evidence given by a different witness, the District Court strayed into the realm of improper fact-finding.

The District Court again strayed into that realm when stating that the assault consisted of only five punches. *See Figueroa*, 59 F. Supp. 3d at 487. Samuel presented eyewitness testimony at trial that the assault involved between six and twelve punches, App. 555, and that it included not only the period of punching but an additional period during which the unidentified officer screamed obscenities at him, grabbed him by the neck, choked him, and shook him, App. 647. To consider the evidence in the light most favorable to Samuel, the District Court should have analyzed the attack as a one-to-two-minute incident, consisting of as many as twelve punches following a period of choking and shaking.

These conclusions require us to vacate so much of the

judgment as dismissed Samuel's failure-to-intervene claims and remand to the District Court.[14] We pause, however, to address a third error in the District Court's analysis, on the theory that it may prove instructive should Samuel's claims be retried.

Having found that the alleged assault on Samuel lasted less than twenty seconds, the District Court granted judgment for Failla and Chan because "[a]ssaults that take place in 'less than thirty seconds' do not offer police officers sufficient time to intercede in order to prevent the assault." *Figueroa*, 59 F. Supp. 3d at 490 (quoting *Sash*, 674 F. Supp. 2d at 545). We think this bright-line rule unsupportable. Failure-to-intervene claims can arise out of a limitless variety of factual circumstances. In each case, the question whether a defendant had a realistic chance to intercede will turn on such factors as the number of officers present, their relative placement, the environment in which they acted, the nature of the assault, and a dozen other considerations. Among these considerations, of course, the assault's duration will always be relevant and will frequently assume great importance. *See, e.g.*, *O'Neill*, 839 F.2d at 11-12 (holding that the defendant officer lacked time to intervene because a different officer hit the plaintiff three times in "rapid succession"). But this does not permit distillation of a hard-and-fast temporal cutoff of the kind relied on by the District Court. Instead, courts must evaluate each case on its own facts,

---

[14] Failla and Chan do not argue that, if a constitutional violation indeed occurred, they are entitled to qualified immunity.

keeping in mind that circumstances other than an assault's duration might bear significantly on an officer's ability to stop it from happening. The essential inquiry is whether, under the circumstances actually presented, an officer's failure to intervene permits a reasonable conclusion that he became a "tacit collaborator" in the unlawful conduct of another. *See id.*

Turning to the facts before us, we conclude that Samuel's failure-to-intervene claims—even assuming that the assault lasted less than twenty seconds—were for the jury to decide. Taking into account all the circumstances and viewing them favorably to Samuel, as required in reviewing a trial court's decision to override the role assigned to the jury, we cannot hold that the assault occurred so quickly that the defendant officers lacked time to intercede as a matter of law. Samuel testified that, at the time he was assaulted, he was sitting in the back of a police cruiser and Failla and Chan were sitting in front. App. 643-44. Nothing in the record suggests that they would have for any reason found it difficult to reach into the backseat, exit the vehicle to assist Samuel, or communicate with the officer who committed the assault. Yet—according to Samuel's testimony—both officers sat passively through the entire event. App. 643-44, 931. In light of the officers' placement relative to Samuel, the apparent absence of any obstacles that might have hindered their ability to intercede, and the assault's stated duration, a reasonable juror could infer that defendants became, by their inaction, "tacit collaborator[s]" in the unlawful conduct alleged.

In sum, in entering judgment for defendants on Samuel's failure-to-intervene claims, the District Court erred by engaging in improper fact-finding and by misapplying the relevant legal standard. As to those claims, the judgment will be vacated and the cause remanded.

## IV. Unlawful Entry into Samuel's Mother's Apartment

On Samuel's claim of unlawful entry, the District Court granted judgment for defendants on the ground that Samuel lacked a legitimate expectation of privacy in his mother's apartment. We hold that this was error.

A person's ability to assert a claim of unlawful entry under the Fourth Amendment depends on whether he "has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). Though a person might subjectively expect privacy in a particular location, that "subjective expectation of privacy is legitimate" only "if it is one that society is prepared to recognize as reasonable." *Minnesota v. Olson*, 495 U.S. 91, 95-96 (1990) (internal quotation marks omitted).

The Fourth Amendment specifically provides that "the people" shall be secure against "unreasonable searches" in "their" houses, U.S. Const. amend. IV, but it has long been recognized that a person may claim a legitimate expectation of privacy in a dwelling other than his own. The Supreme Court held in *Minnesota v. Olson*, 495 U.S. at 98, that an "overnight guest" can legitimately expect privacy in his host's home. The Court has never extended this

37

holding to embrace all social guests, but it is clear that "overnight" status is not a precondition to a guest's ability to contest a search of his host's dwelling. *See Minnesota v. Carter*, 525 U.S. 83, 90 (1998) (holding that a guest lacked a legitimate expectation of privacy in his host's apartment because there was nothing "*similar to* the overnight guest relationship in *Olson* to suggest a degree of acceptance into the household" (emphasis supplied)); *United States v. Fields*, 113 F.3d 313, 321 (2d Cir. 1997) ("Although *Olson* establishes that status as an overnight guest *can* give rise to a legitimate expectation of privacy, it does not suggest that such status is required before a guest can have privacy in the home." (citation omitted)).

In determining whether a guest who is not an "overnight guest" may legitimately expect privacy in his host's home, we look to a number of different factors. In *Minnesota v. Carter*, for example, the Supreme Court focused on whether the guest's visit was social or commercial in nature, the length of time the guest spent on the premises, and the presence or absence of a previous connection between the guest and the householder. 525 U.S. at 90-91. Courts have also considered whether the guest possesses a key to the dwelling, is permitted to make use of the premises in the householder's absence, *Fields*, 113 F.3d at 320, or keeps belongings in the host's home, *see United States v. Rhiger*, 315 F.3d 1283, 1287 (10th Cir. 2003). These and related considerations shed useful light on our ultimate inquiry: whether the host has so liberally shared his own privacy interest with his guest that it shelters the guest against unreasonable government intrusion.

38

With these principles in mind, we turn to the particulars of Samuel's relationship with his mother's apartment. During his deposition, Samuel stated that he was "visiting" his mother on the evening of June 30, 2010 and did not live in her apartment (or, indeed, in the same borough), but he would not say where he *did* live. Dep. Eli Samuel at 18-20, Figueroa v. Mazza, No. 11 Civ. 3160 (JBW) (E.D.N.Y. July 31, 2014), ECF No. 148-1. He also stated that he was about to leave the apartment at the time the officers arrived, but he did not say whether he intended to return that night. *Id.* at 24. After defendants moved for summary judgment, Samuel submitted an affidavit—which the District Court did not exclude— supplementing this information. In the affidavit, he stated that for more than a year prior to his arrest, he had been staying at his mother's apartment three nights a week.[15] Decl. Eli Samuel at 2 ¶ 11, Figueroa v. Mazza, No. 11 Civ. 3160 (JBW) (E.D.N.Y. Aug. 18, 2014), ECF No. 157-9.

The District Court concluded that this information, even viewed in the light most favorable to Samuel, did not demonstrate that he possessed a legitimate expectation of privacy in his mother's apartment. In an oral ruling granting defendants' motion for summary judgment, the Court observed that Samuel "was not a

---

[15] A party may not create an issue of fact that will defeat summary judgment by submitting an affidavit that contradicts the party's prior deposition testimony, but it is permissible to clarify by affidavit ambiguous or incomplete deposition testimony. *Maxwell v. City of New York*, 380 F.3d 106, 109 (2d Cir. 2004). Nothing in Samuel's affidavit contradicts the testimony he gave at his deposition.

resident" of the apartment, "temporarily or any other way," and that "he was about to leave the apartment" at the time of his arrest. Tr. Oral Ruling at 9, Figueroa v. Mazza, No. 11 Civ. 3160 (JBW) (E.D.N.Y. Aug. 21, 2014), ECF No. 220. For several reasons, we cannot agree with the District Court's analysis.[16]

First, the Court's emphasis that Samuel did not "reside[ ]" in his mother's apartment was misplaced. A person need not "reside" in a particular dwelling, in the sense of living primarily at that location, to enjoy a legitimate expectation of privacy when he is on the premises. As we have already discussed, a social guest can, under some circumstances, legitimately expect privacy in his host's home. *See Olson*, 495 U.S. at 98.

Second—though the District Court's oral ruling is not perfectly clear on the point—it appears that the Court might have concluded that because Samuel "was about to leave the apartment" when he was arrested, he did not qualify as an "overnight guest" and thus could not claim a legitimate expectation of privacy in the property. Tr. Oral Ruling at 9, Figueroa v. Mazza, No. 11 Civ. 3160 (JBW) (E.D.N.Y. Aug. 21, 2014), ECF No. 220. (The Court might have reasoned that if Samuel was leaving the apartment at 10:00 p.m., the time of his arrest, he was not likely to come back that night.) Even if the Court correctly concluded that Samuel was not an "overnight

---

[16] As is true of Samuel's failure-to-intervene claims, defendants do not argue that they are entitled to qualified immunity on the unlawful-entry claims if their conduct violated the Fourth Amendment.

40

guest" as the case law uses the term—a question we need not decide[17]—it nonetheless erred in determining that, as a matter of law, he did not legitimately expect privacy in his mother's apartment.

The Fourth Amendment looks with favor on "overnight guests" not because there is something talismanic about a person's intent to stay in a dwelling on a particular night, but because a host's willingness to take in a guest to sleep—slumber being a vulnerable state during which privacy is cherished—indicates that the guest has been accepted into the private sphere of the household. *Carter*, 525

---

[17] The cases do not define the phrase. In *Olson*, for instance, the defendant had slept in the searched dwelling the night prior to the search (which occurred late in the afternoon). *Olson*, 495 U.S. at 93-94, 97 n.6. But for "several days" before that, he had been sleeping someplace else, *id.* at 97 n.6, and the Court did not discuss whether he had ever slept in the relevant dwelling before or had planned to sleep there the night after the search occurred. (The facts suggested that the defendant had not planned to sleep in the dwelling a second night: the police had been told that he planned to "leave town." *Id.* at 93.) The Supreme Court nevertheless characterized the defendant as an "overnight guest" and held that he was entitled to claim the protection of the Fourth Amendment in his hosts' home.

We need not determine what this says about whether Samuel—who often stayed in his mother's apartment, but might not have stayed there the night before his arrest and might not have planned to stay there the night of his arrest—was an "overnight guest." Nor do we think such an exercise would be particularly useful. As discussed below, a person's status as an "overnight guest" matters because sleeping in a dwelling says much about one's connection with the property and one's expectations while present there; the law can take account of these considerations without drawing hard lines concerning what kind of guest counts as an "overnight" one.

U.S. at 90; *Olson*, 495 U.S. at 99-100. Construing the record in the light most favorable to Samuel, we conclude that ("overnight guest" or not) he enjoyed a degree of acceptance into his mother's home sufficient to trigger Fourth Amendment protection. Indeed, each factor mentioned in *Carter* weighs strongly in Samuel's favor. His visit was social in nature. He had, in the past, spent a great deal of time at the apartment, sleeping there nearly as frequently as he slept at his own dwelling. He had a close relationship—indeed, a familial one—with the apartment's tenant. We have found no case denying Fourth Amendment standing on similar facts, and have found a number of cases finding Fourth Amendment standing on less convincing facts. *See, e.g.*, *Fields*, 113 F.3d at 321 (concluding that the defendant possessed a legitimate expectation of privacy in an apartment to which he was invited by a guest of the tenant, and where he spent "several hours before being interrupted by [a] police intrusion"); *Rhiger*, 315 F.3d at 1285-87 (finding Fourth Amendment standing in the case of a guest who had known his host for "about two weeks," had slept at the host's home two to four times, and had once entered the home unannounced to take a nap).

Accordingly, we conclude that Samuel's unlawful-entry claims should have survived a motion for summary judgment.[18] We

---

[18] Defendants also argue that, even if Samuel enjoyed a legitimate expectation of privacy in his mother's apartment, this portion of the judgment can stand because the trial record shows that Samuel's mother consented to defendants' entry. We disagree. The officers so testified, but Samuel testified that his mother did nothing more than open the door a foot or two before Samuel stepped in front of her. App. 627-28. If Samuel is believed, his mother did not

thus vacate so much of the judgment as dismissed those claims and remand to the District Court for such further pretrial proceedings as may be appropriate in the circumstances, or for trial.

## V. Dismissing the Unnamed Defendants and Closing Discovery

In an order announced on May 1, 2014, the District Court dismissed from the case all unnamed defendants, reasoning that the case had been pending for several years and that Samuel still had not identified the unnamed individuals. Tr. Proceedings at 46-47, Figueroa v. Mazza, No. 11 Civ. 3160 (JBW) (E.D.N.Y. May 1, 2014), ECF No. 119. Samuel states that in this same order, the District Court closed discovery. We are unable to locate any such language in the order, but it is clear that on several occasions the District Court refused Samuel's requests for further discovery of documents. *See, e.g.*, Order at 2, Figueroa v. Mazza, No. 11 Civ. 3160 (JBW) (E.D.N.Y. Mar. 3, 2014), ECF No. 87.

Samuel asserts that the District Court erred or "abused its discretion" in entering these orders. He argues that the District Court dismissed the unnamed defendants and closed discovery because counsel for defendants represented that all relevant documents had been produced. *See id.* After the May 1, 2014 order, however, defendants supplemented discovery by producing 200 pages of new documents—most of it in the month before trial. Pl.'s

---

consent to defendants' entering her apartment. *See United States v. Vasquez*, 638 F.2d 507, 527 (2d Cir. 1980) (concluding that merely opening a door when officers knock is not consent).

43

Br. 39. Samuel appears to argue that if he had received these documents earlier, he could have used the information they contained to depose new witnesses and uncover the identity of some unnamed defendants.

This argument is unpersuasive. Samuel does not explain why, in his view, the District Court was wrong to rely on defense counsel's statements that all documents had been turned over. He does not argue, for instance, that at the time it made its rulings the District Court had been made aware of information throwing doubt on the accuracy of counsel's representations.[19] Rather, he appears to suggest that the mere fact of defendants' late production renders the District Court's order infirm. But if the Court had no reason to think that defendants possessed additional documents—and, indeed, had excellent reason (counsel's representations) to think they did not—it cannot now be faulted for closing discovery and moving the case toward a conclusion. Accordingly, we find no error in the District Court's discovery rulings.

**CONCLUSION**

To summarize, we hold as follows:

(1) Defendants are entitled to qualified immunity with respect to Samuel's false arrest claims, because we cannot say that, in the circumstances obtaining at the time of Samuel's arrest, no

---

[19] Samuel does not appear to have sought additional discovery *after* the new documents were produced. *See* Pl.'s Br. 39-40; Pl.'s Reply Br. 47-50.

reasonable police officer could have concluded that probable cause existed.

(2) The force employed by Detectives Karolkowski and Failla in effecting Samuel's arrest was reasonable as a matter of law.

(3) On the basis of the evidence presented at trial, a reasonable juror could have determined that Detectives Failla and Chan had a realistic opportunity to intervene in the alleged assault on Samuel but failed to do so.

(4) The facts in the summary-judgment record would have allowed a reasonable juror to conclude that Samuel enjoyed a legitimate expectation of privacy in his mother's apartment.

(5) The District Court did not err or "abuse its discretion" when it entered rulings dismissing unnamed defendants from the case and refusing Samuel's requests for further discovery.

Accordingly, we **AFFIRM** the District Court's September 30, 2014 judgment insofar as it (1) granted judgment in defendants' favor on Samuel's claims for false arrest, excessive force, and assault, (2) denied further discovery, and (3) dismissed unnamed defendants from the case. We **VACATE** so much of the judgment as granted judgment in defendants' favor on Samuel's claims for failure to intervene and unlawful entry and **REMAND** the cause to the District Court for such further pretrial proceedings as may be appropriate in the circumstances, or for trial.

45

KEARSE, Circuit Judge, dissenting in part:

I respectfully dissent from so much of the majority's opinion as rules that "[t]he trial record establishes" "as a matter of law," Majority Opinion, ante at 5, 16, that the defendant detectives, most of them from the New York City Police Department's 72nd Precinct (or "Precinct"), who arrested plaintiff Eli Samuel Figueroa ("Samuel") on a charge of endangering the welfare of a child, are entitled to qualified immunity with respect to Samuel's false arrest claims, on the basis that a reasonable law enforcement official in their position could have concluded that there existed probable cause to arrest Samuel on the night of June 30, 2010, giving them "arguable" probable cause. My disagreement has several sources, among them the following: First, the record in this case shows that the defendants' relevant knowledge consisted not just of their observations of the Duane Reade photographs of a nude boy on June 29 but rather included repeated complaints about suspected sexual abuse of the boy, complaints made by Samuel and the boy's mother Shirley Saenz ("Saenz") to the police department--beginning at the 72nd Precinct--over the preceding two weeks. Second, the majority opinion does not, although it claims to, "view the facts in the light most favorable to Samuel," id. at 6 n.1, which is required in awarding his opponents judgment as a matter of law. Third, the majority appears to ignore the fact that it is granting judgment as a matter of law on the basis of qualified immunity, an affirmative defense. In taking issue with this dissent, the majority focuses on "Samuel's . . . false arrest claims" and the evidence "Samuel . . . offered . . . to support them" and states, "our analysis of Samuel's false arrest claims does not take account of evidence--such as a series of written reports from a Detective Hawkins concerning Saenz's mid-June complaint to police--that was never put before the jury," Majority Opinion at 15 n.8 (emphases added). However, the proper focus for the majority's decision is not whether Samuel presented sufficient evidence on the elements

of his false arrest claims (including the absence of probable cause--an absence that the properly instructed jury presumably found proven in finding defendants liable to Samuel on these claims). For the grant of judgment as a matter of law to these defendants on the basis of qualified immunity, the proper question is whether the evidence compels the conclusion that it was objectively reasonable for a police officer in their position to believe there was probable cause to arrest Samuel--an affirmative defense on which defendants have the burden of proof.

Fourth, in my view, what should properly be considered on the issue of arguable probable cause in the present appeal includes all relevant evidence in the district court's record, not just the evidence admitted at trial. Although the majority states that "[i]n considering defendants' Rule 50 motion as to [Samuel's] claims, the District Court properly confined its review to the trial record, . . . and we must do the same in considering the claims on appeal," Majority Opinion at 15 n.8, this position suffers a major flaw: The Rule 50 motion granted by the district court was based on the position that Samuel had failed to prove the absence of probable cause as an element of false arrest, see Figueroa v. Mazza, 59 F.Supp.3d 481, 490-91 (E.D.N.Y. 2014); that decision indeed was to be made on the basis of the evidence admitted at trial. But this is not the basis for the majority's grant of judgment as a matter of law. The majority's decision is that defendants are entitled to judgment as a matter of law on the basis of qualified immunity because it views probable cause as "arguable." The qualified immunity defense was never submitted to the jury; there is thus no reason to limit consideration to the evidence that was admitted. Further, the reports by Detective Deborah Hawkins, which the majority chooses not to consider, are in the district court record. (See, e.g., Trial Transcript ("Tr.") 551 (statement of defense counsel to the court: "There are documents that explicitly say--that are listed as plaintiff's exhibits that explicitly say Detective Hawkins looked at the reports from the pediatrician . . . and that, in fact, the police department called the pediatrician and said you indicated

2

**in this letter** that you thought that **there might have been some sort of anal penetration.** What made you say that? And he said I don't know, **it's possible.**" (emphases added)).) The Detective Hawkins reports were in fact offered in evidence at trial--by each side--but were excluded (erroneously each time, in my view: erroneously when offered by Samuel, since the reports (a) showed that the pediatrician confirmed to Detective Hawkins Saenz's statement that the doctor himself thought "some sort of anal penetration" was "possible," and (b) confirmed that the police department had in its possession a letter from the doctor to that effect; and erroneously when offered by defendants to show that Hawkins had in fact investigated before reaching a different conclusion).

Finally, even if consideration of defendants' entitlement to the defense of qualified immunity as a matter of law is limited to the evidence that was admitted at trial, there was ample evidence that in the two weeks preceding Samuel's arrest Saenz had complained to the police at the 72nd Precinct and to Detective Hawkins of suspected sexual abuse of her son by the boy's father; evidence that the police and Detective Hawkins were well aware of Saenz's attempts to document her suspicion with before-and-after pictures; evidence that Saenz had informed Detective Hawkins that two doctors had opined that such molestation was possible; and, in the words of defendants' own attorney, evidence "that there are doctor reports that indicate that abuse was happening" (Tr. 550).

There was evidence that Samuel complained to the police department's Internal Affairs Bureau ("IAB") asserting that Detective Hawkins had failed to investigate; in that complaint Samuel detailed Saenz's complaints to the police and her submission to the police of before-and-after pictures; and defendants, prior to arresting Samuel, were indisputably aware of Samuel's IAB complaint. The police department records of these repeated attempts by Samuel and Saenz to get the police to prevent what the boy's mother and doctors thought could be sexual abuse eliminated any objectively

3

reasonable basis for any officer to believe there was probable cause to arrest Samuel for child pornography or child endangerment.

A. The Trial Evidence

It is undisputed that for some two weeks prior to the arrest of Samuel, Shirley Saenz, accompanied by Samuel, had repeatedly complained to the police that, when her son had an overnight visit with his father, the boy was returned to her with bruises and swelling in his anal area and that doctors said it was possible that the boy was being sexually molested. Saenz testified at trial: "[O]n June 5th of 2010, my son came back to me with red anal swelling"; "I took him to Methodist Hospital"; "I showed the doctor, Doctor Farebrothers [sic], and she said it looks like my son was getting molested, so she made a report to the state central registry." (Tr. 58-59; see, e.g., id. at 119 ("the hospital told me on June 5th that it was possible that my son was getting molested").) When her son "continued to come back" from visits with his father "with anal traumas," Saenz complained to the police and began to document the boy's changed condition with pictures of him before and after his visits with his father; she was allowed to take such pictures in the police station. (Tr. 57 ("at the precinct . . . the police officer said it was fine to do it like away from the public in the backroom").) Other sets of pictures were taken in the office of the boy's pediatrician; Saenz testified that that doctor too "had told me that it looked like my son was getting possibly anally penetrated and he wrote a letter to the Family Court" (Tr. 58; see also id. at 118-19 ("Doctor Hassan, my son's ped[iatric]ian, said that it was possible my son was getting molested. That's what he said and he wrote it in a letter . . . .")).

On June 15, two weeks before the police department's June 29 receipt of the Duane Reade photos on which they based their arrest of Samuel, Saenz--accompanied by Samuel--had

4

informed police at the 72nd Precinct and Detective Hawkins at the police department's Brooklyn Child Advocacy Center ("Child Advocacy Center") of her suspicion that her son was being molested by his father, and had given them pictures that like, the Duane Reade photos, were before-and-after pictures of the boy's body. (See, e.g., Tr. 64-65 (testimony of Saenz); 533-37, 541-42 (testimony of Samuel).) Saenz testified:

> I went to the 72nd Precinct. I told them that I was taking the photographs on the advise [sic] of my attorney and according to Social Service laws 415, 416, 419, and then I told them that I was concerned that my son could have been getting molested and they didn't let me write a report. They just took a copy of everything that I had, like the hospital record, the photographs and they faxed it over to Brooklyn Child Advocacy Center and they made copies and I spoke with--spoke with Lieutenant Jaime Ortiz . . . . And there was like another officer there, and they actually put me on the phone with Detective Deborah Hawkins . . . .

(Tr. 64-65 (emphases added).) In that telephone conversation, Saenz told Detective Hawkins "I think my son is getting molested, this is what the doctor said . . . ." (Tr. 65; see also id. at 542 (testimony of Samuel that 72nd Precinct officers faxed to Detective Hawkins "[t]he doctor's report--before-and-after doctor's report").)

On June 16, Saenz went to the Child Advocacy Center and met with Detective Hawkins, who had received the materials--including the photos--sent to her by the officers at the 72nd Precinct. Saenz testified that when Detective Hawkins asked "why do you think your son is getting molested. I told her it was based on what my doctor said, based on what the hospital said." (Tr. 66.)

Saenz testified that Detective Hawkins would not allow her to make a formal complaint of child abuse. Saenz complained that the police department and Detective Hawkins, "didn't do anything." (Tr. 59.)

5

On June 28, Samuel telephoned IAB, identified himself, and complained that Hawkins had not allowed Saenz to file a child-abuse complaint against the boy's father. (See Tr. 544-48.) Samuel's IAB complaint was "[v]ery detailed" (Tr. 547) as to Saenz's efforts, including her showing the police the pictures she had taken to document her concerns. He provided addresses and telephone numbers for the boy's father, as well as for Saenz's mother Beatrice Saenz ("Beatrice"), about whom Samuel also complained.

Defendants plainly were aware of the contents of Samuel's June 28 complaint to IAB: It was only by means of information in that complaint that they located Beatrice, whom they interviewed prior to arresting Samuel. And, as the majority opinion notes, in all other respects "defendants do not contest that all relevant officers had knowledge of Samuel's complaint and Saenz's report at all relevant times," Majority Opinion at 9 n.5 (emphasis added); see id. at 9 n.6.

B. The "Arguable Probable Cause" Standard Is Not Met

When determining whether actual probable cause existed, we "look to the totality of the circumstances" as to what the officers knew at the time of the arrest; we "must consider those facts available to the officer at the time of the arrest and immediately before it," bearing in mind that "an officer may not disregard plainly exculpatory evidence." Fabrikant v. French, 691 F.3d 193, 214 (2d Cir. 2012) (internal quotation marks omitted) (emphases mine); see also Hunter v. Bryant, 502 U.S. 224, 229 (1991) (qualified immunity does not protect "the plainly incompetent" (internal quotation marks omitted)). "Review for probable cause should encompass plainly exculpatory evidence alongside inculpatory evidence to ensure the court has a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest." Stansbury v. Wertman, 721 F.3d 84, 93 (2d Cir. 2013) (internal quotation marks omitted) (emphasis mine).

6

In determining whether there was "arguable" probable cause, for purposes of qualified immunity, our focus is no narrower; "we examine the same evidence under the same circumstances," id. at 89 n.3, for arguable probable cause does not "mean 'almost' probable cause," Jenkins v. City of New York, 478 F.3d 76, 87 (2d Cir. 2007). Rather, the test for arguable probable cause is "whether it was objectively reasonable for the officer to conclude that probable cause existed." Id.

The majority acknowledges that "an officer making a probable-cause determination is not at liberty to ignore evidence tending to exculpate the suspect . . . and that the officers [here] were accordingly not entitled to disregard . . . their knowledge of Saenz's earlier photos," Majority Opinion at 23. The majority finds arguable probable cause, however, on the basis that "officers of reasonable competence could have . . . disbelieved Saenz's explanation"--apparently referring to her reason for taking photos of her unclothed son--and that "[t]he officers were not required to accept Saenz's account on faith," Majority Opinion at 23, 24 (emphases added). This would be far more persuasive if defendants were considering an explanation given after-the-fact and if ample support for Saenz's "account" were not already in police records weeks before receipt of the Duane Reade photos. As the police had no contact with Saenz between their June 29 receipt of the Duane Reade photos and Samuel's June 30 arrest, the reference to a Saenz "explanation" apparently refers to Saenz's proffers of such photographs earlier. But police department records clearly documented that Saenz had submitted such photos to the police in mid-June in an effort to provide evidentiary support for her suspicions of child abuse by the boy's father. And whether or not her suspicions were correct, it is undisputed that Saenz repeatedly told Detective Hawkins that both the boy's pediatrician and Doctor Fairbrother at Methodist Hospital had stated that it was possible that the boy had been subjected to some type of anal penetration.

7

Officers of course are not required to take a complainant's assertions "on faith," and defendants here certainly were not required to believe that Saenz's son had in fact been abused by his father. But nor were defendants entitled to conclude without any investigation that Saenz's repeated communications of her concerns to the police department were a sham. And the most obvious line of inquiry would have quickly shown that her concern was genuine. As defendants "at all relevant times" "had knowledge of Samuel's complaint and Saenz's report," Majority Opinion at 9 nn.5-6, the most obvious course would have been to inquire of Detective Hawkins, who was most sharply criticized in Samuel's complaint to IAB about the handling of Saenz concerns. Had they inquired, defendants would have learned that Detective Hawkins's file included a copy of the letter from the pediatrician indicating that he thought that there might have been some sort of anal penetration (see Tr. 542 (72nd Precinct officers faxed to Detective Hawkins "[t]he doctor's report--before-and-after doctor's report")). Further, if defendants had read Detective Hawkins's reports, they would have seen that the pediatrician reiterated to Detective Hawkins that "it's possible" that "there might have been some sort of anal penetration" (Tr. 551 (statement of defense counsel)).

This record--whether or not Detective Hawkins's reports are considered--does not allow defendants to prevail on a defense of arguable probable cause, for they were not entitled to ignore the record of Saenz's efforts, with Samuel's assistance, to protect her son. Defendants knew of the complaints to--and about--Detective Hawkins. If they asked what was in Detective Hawkins's files or what her investigation had turned up, they could not "disbelieve[]" Saenz's "explanation" except by arbitrarily ignoring this clearly exculpatory evidence that resided in the relevant police records. And if they failed to inquire, their investigation clearly was not competent. Qualified immunity does not protect "the plainly incompetent." Hunter, 502 U.S. at 229 (internal quotation marks omitted).

8

The majority's view that a reasonable officer could have concluded that the photos constituted crimes of child pornography or child endangerment on the theory that Saenz was willing to share nude pictures of the boy "with perfect strangers," to wit, the "Duane Reade employees [who] would likely see the photos in the normal course of developing them," Majority Opinion at 26, improperly draws inferences contrary to Samuel and the record. The Duane Reade surveillance tape that police officers reviewed on June 30 showed that Saenz in fact had attempted to have the pictures-- taken with a digital camera--printed not by Duane Reade employees but rather by a Duane Reade computerized self-service printer. The photos were eventually retrieved from the printer by a Duane Reade employee only because the self-service system had malfunctioned. Saenz's thwarted attempt to print the pictures herself in no way indicated a willingness to have them seen by strangers.

In my view, in light of these facts that were known to the police, and were known or available to defendants prior to Samuel's arrest, no reasonable officer could have concluded that there was probable cause to believe that the crime of either child pornography or child endangerment had been committed.

I note that the majority does not actually specify the crime as to which it concludes defendants had arguable probable cause to arrest Samuel; if they had arguable probable cause as to any crime, even if there was not agreement among the defendants as to which crime, they were entitled to that defense, cf. Devenpeck v. Alford, 543 U.S. 146, 152-56 (2004). For the reasons stated above, I see no basis for arguable probable cause as to child pornography or child endangerment. Nor was there a basis to arrest Samuel for kidnaping. Although the majority opinion suggests that defendants, having viewed the June 25 Duane Reade photos, did not know Saenz's son was not being held as a "kidnap[]" victim until "[s]hortly after Samuel's [June 30] arrest," Majority Opinion at 11-12 (emphasis added), they in fact knew he was not being so held before Samuel was arrested. Police

9

records show that at 9 p.m. on June 30, defendant Todd Nagrowski and other officers interviewed Saenz's roommate, who told them, inter alia, that she had left Saenz and the boy asleep in the living room that morning. As the majority concedes, defendants were "not entitled to disregard th[is] information from [Saenz's roommate]," Majority Opinion at 23. Thus, when Nagrowski and others proceeded to arrest Samuel after 10 o'clock that night, defendants had no reason to believe there had been a kidnaping.

Finally, even if there had been arguable probable cause to believe a crime had been committed, there was no evidence to warrant a person of reasonable caution in the belief that the crime had been committed by Samuel. The police had no evidence that Samuel had any role in the taking of the Duane Reade pictures, or was present when they were taken, or participated in the attempt to have them printed. The police reviewed the Duane Reade surveillance tape of the person attempting to have the pictures printed; that person was a woman. The 11 telephone calls to Duane Reade thereafter, asking that the pictures not be printed, were all made by a woman. In addition, the photos included an image of a dated money order, and the police were able to obtain a surveillance picture of its purchase; they saw that the purchaser of the money order was also a woman.

The only objective evidence the police had of any conduct by Samuel in connection with the Duane Reade photos was that he had accompanied Saenz when she gave similar pictures to the police in an effort to prevent further harm to her son, that he complained to IAB when the police refused to assist Saenz in that effort, and that he apparently loaned the woman who called Duane Reade his phone.

Given the totality of the circumstances, including the documentation in the police files as to Saenz's intense communications with the police about her suspicion that her son was being abused, accompanied by her report of multiple doctors' statements and a copy of least one doctor's

10

written opinion that her suspicion could be correct--all of which defendants knew or should have known--I dissent from so much of the majority opinion as rules that defendants are entitled to qualified immunity on Samuel's false arrest claims as a matter of law.