*Washington v. Napolitano*

# United States Court of Appeals
## for the Second Circuit

———————————————————

August Term 2020

(Argued: February 3, 2021    Decided: March 23, 2022)

No. 20-455

———————————————————

LAURENCE WASHINGTON,

*Plaintiff-Appellee,*

— v. —

DETECTIVE, #314 FRANK NAPOLITANO AND FRANCIS JOSEPH MCGEOUGH,

*Defendants-Appellants,*

HONORABLE JULIA DEWEY, DAVID ZAGAJA, PROSECUTOR, EAST HARTFORD POLICE DEPARTMENT, DETECTIVE, #310 D. ORTIZ,

*Defendants.*\*

———————————————————

Before:    JACOBS, SULLIVAN, AND BIANCO, *Circuit Judges.*

Defendants-Appellants Detective Frank Napolitano and Sergeant (now Lieutenant) Francis McGeough appeal from an order, entered on January 10, 2020,

———————————

\* The Clerk of Court is respectfully directed to amend the official caption in this case to conform to the caption above.

by the United States District Court for the District of Connecticut (Bryant, *J.*), denying their motion for summary judgment under Federal Rule of Civil Procedure 56(a). Appellants challenge the district court's determination that absolute prosecutorial immunity does not apply to their alleged conduct in this case, and that they are not entitled to qualified immunity at the summary judgment stage for plaintiff-appellee Laurence Washington's Fourth Amendment claims of false arrest and malicious prosecution brought pursuant to 42 U.S.C. § 1983.

On this interlocutory appeal, our review is limited to the rulings on absolute and qualified immunity, and we affirm the district court's denial of summary judgment on both grounds. First, we agree with the district court that absolute prosecutorial immunity did not apply to appellants' participation in obtaining the arrest warrant for Washington. Long-standing precedent makes clear that swearing to an arrest warrant affidavit and executing an arrest are traditional police functions, and performing such functions at the direction of a prosecutor does not transform them into prosecutorial acts protected by absolute immunity. Second, the district court correctly determined that summary judgment on the issue of qualified immunity was unwarranted given the factual disputes in this case. The district court identified relevant and exculpatory omissions from the arrest warrant affidavit related to Washington's intent and credibility that, construing the evidence in a manner most favorable to Washington, could have materially impacted a magistrate judge's determination as to whether probable cause existed for Washington's arrest, and such factual issues preclude summary judgment for appellants on the ground of qualified immunity at this stage of litigation.

Accordingly, we **AFFIRM** the order of the district court and **REMAND** the case for further proceedings consistent with this opinion.

TADHG DOOLEY (John M. Doroghazi, Jenny R. Chou, *on the brief*), Wiggin and Dana LLP, New Haven, CT, *for Plaintiff-Appellee*.

JAMES N. TALLBERG (Andrew Glass, *on the brief*), Karsten & Tallberg, LLC,

2

Rocky Hill, CT, *for Defendants-Appellants*.

_____

JOSEPH F. BIANCO, *Circuit Judge*:

Defendants-Appellants Detective Frank Napolitano and Sergeant (now Lieutenant) Francis McGeough appeal from an order, entered on January 10, 2020, by the United States District Court for the District of Connecticut (Bryant, *J.*), denying their motion for summary judgment under Federal Rule of Civil Procedure 56(a). Appellants challenge the district court's determination that absolute prosecutorial immunity does not apply to their alleged conduct in this case, and that they are not entitled to qualified immunity at the summary judgment stage for plaintiff-appellee Laurence Washington's Fourth Amendment claims of false arrest and malicious prosecution brought pursuant to 42 U.S.C. § 1983.

The lawsuit principally focuses upon the question of whether there was probable cause to believe that Washington was a knowing participant, rather than merely present, during a robbery and murder that took place in a car on the night of May 16, 2016 in East Hartford, Connecticut. After placing Washington in the witness protection program upon his self-reporting of the crime to the police on

the morning after the robbery/murder, as well as after obtaining an arrest warrant for the alleged shooter based upon information provided by Washington (who was described in the warrant affidavit as "credible"), appellants sought and obtained an arrest warrant for Washington. The warrant affidavit for Washington relied almost exclusively on Washington's own statement to the police regarding the robbery/murder to establish probable cause for his arrest. The district court concluded that, although the affidavit contained a general denial from Washington regarding his knowing participation in the robbery/murder, it omitted relevant and exculpatory portions of Washington's statement to the police including, among other things, that: (1) Washington was unaware that the shooter had a gun when Washington entered the car; (2) after firing a warning shot in the car, the shooter was pointing the gun at Washington when he demanded that Washington take the victim's glasses in the car; and (3) Washington feared for his own life during the events in the car and believed the shooter would try to kill him. The district court held that summary judgment on the probable cause question was unwarranted because the omissions in the affidavit created material issues of fact as to the weight that a neutral magistrate judge would have given to that exculpatory information in the probable cause determination, and as to

4

whether appellants acted deliberately or recklessly in omitting such information. The district court similarly concluded those same issues of fact regarding the omissions precluded summary judgment on the issue of arguable probable cause as it related to the application of the doctrine of qualified immunity.

On this interlocutory appeal, our review is limited to the rulings on absolute and qualified immunity, and we affirm the district court's denial of summary judgment on both grounds. First, we agree with the district court that absolute prosecutorial immunity did not apply to appellants' participation in obtaining the arrest warrant for Washington. Long-standing precedent makes clear that swearing to an arrest warrant affidavit and executing an arrest are traditional police functions, and performing such functions at the direction of a prosecutor does not transform them into prosecutorial acts protected by absolute immunity. Second, the district court correctly determined that summary judgment on the issue of qualified immunity was unwarranted given the factual disputes in this case. The district court identified relevant and exculpatory omissions from the arrest warrant affidavit related to Washington's intent and credibility that, construing the evidence in a manner most favorable to Washington, could have materially impacted a magistrate judge's determination as to whether probable

cause existed for Washington's arrest, and such factual issues preclude summary judgment for appellants on the ground of qualified immunity at this stage of litigation.

In reaching this decision, we recognize and do not disturb well-settled precedent establishing that an officer is not required to investigate an individual's innocent explanations as to an alleged crime, nor to resolve all credibility issues between witnesses, before making an arrest based on probable cause. Neither of these bedrock legal principles are at issue here because it is uncontroverted that appellants already had the exculpatory information in their possession at the time of the submission of the arrest warrant application and there is evidence that, when construed most favorably to Washington, appellants had fully credited such information. Accordingly, we hold that, if a police officer finds an individual's statements regarding his lack of intent to commit a crime to be credible in light of the totality of the circumstances, or if (at the very least) such exculpatory statements could materially impact the probable cause determination by a neutral magistrate judge, that officer cannot then use the incriminating portions of those statements as the foundation for probable cause in an arrest warrant affidavit for that individual, while either knowingly or recklessly concealing from the judge

6

that credibility assessment (if it has been reached) and/or the exculpatory details of those statements. It is clearly established in this Circuit that such a concealment, which deprives the judge of material information that could impact the probable cause determination, would not be protected by qualified immunity. Therefore, the district court properly denied the motion for summary judgment on the ground of qualified immunity.

Accordingly, the order of the district court is **AFFIRMED**, and the case is **REMANDED** to the district court for further proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND

In the context of a summary judgment motion, the evidence must be viewed in the light most favorable to Washington, as the non-moving party, including all reasonable inferences being drawn in his favor. *See Amore v. Novarro*, 624 F.3d 522, 529 (2d Cir. 2010). With that legal principle in mind, the evidence in support of Washington's claims is summarized below.

### A. Washington's Account

Washington's account of the robbery and murder, as he told it to Detective Napolitano, was as follows. What matters for our purposes is that exculpatory

portions of his statement were omitted from the warrant affidavit notwithstanding that the officers may have credited that account before seeking the warrant.

After work on the night of May 16, 2016, Washington was drinking, smoking marijuana, and watching basketball in his apartment with a friend, "Black." That evening, a recent acquaintance of Washington, Michael Gaston, known to Washington as "G," knocked on Washington's door and asked if he wanted to smoke marijuana together. Washington invited him into the apartment and the three men continued to drink, smoke, and watch the basketball game. At halftime, having run out of marijuana, Gaston stated he would go out to buy more, and Washington walked with him to the local convenience store. At the store, Gaston spoke with a man not known to Washington, later identified as Marshall Wiggins, while Washington bought cigarettes and soda. All three men exited the store. As Washington was about to head back to his apartment, Gaston asked Washington to accompany him and Wiggins by car to Wiggins' home in order to buy a larger amount of marijuana. Washington agreed.

Washington was unaware when he entered the car that Gaston had any intention to rob Wiggins, nor did he know that Gaston had a gun. Washington dozed off in the back passenger seat of the car as Gaston, in the front passenger

8

seat, and Wiggins, in the driver's seat, talked. When Washington opened his eyes as the car stopped, he saw Gaston pointing a gun at Wiggins. Gaston then directed Wiggins to hand over his rings and glasses, and when Wiggins did not, Gaston fired a warning shot.[1] Gaston then pointed the gun at Washington and gestured for Wiggins to give his glasses and rings to Washington. Washington described feeling scared, and that he could not believe what was happening. As Wiggins dropped the glasses in Washington's hand, Wiggins moved for the gun in Gaston's hands. During their struggle for the gun, a fatal shot was fired, and Washington jumped out of the car and ran away on foot.[2] When Washington stopped running, he realized he still had the glasses in his hand. He then dropped them on the ground. He also shed his sweatshirt and put it into a dumpster before continuing to run to his apartment.

---

[1] A bullet hole was subsequently discovered in the rear driver's-side window of Wiggins' car.

[2] Washington further testified at his deposition that this moment – when neither Gaston nor Wiggins had a full grasp on the gun – was his "first chance" to run away. Joint App'x at 240. He stated that he had explained to appellants the context in which he was sitting in the vehicle, including that he had a gun pointed at him. Joint App'x at 240. At Detective Napolitano's deposition, when asked if Washington had told him that he "wasn't going to say no to Mr. Gaston while Mr. Gaston had a gun pointed at him . . . and Mr. Wiggins," Detective Napolitano confirmed that, while not recalling the exact words, Washington had told him something to that effect. Joint App'x at 274.

Back at his apartment, Washington told Black what had just occurred. At that moment, Gaston reappeared at the door asking for Washington's help retrieving the murder weapon from a dumpster. Fearing that Gaston sought to kill him too, Washington lied to get away and ran to the hospital where he checked himself in, reporting suicidal ideations.

## B. Use of Washington's Account in the Arrest Warrant

It is uncontroverted that the next day, May 17, 2016, Washington called and reported the robbery and murder to the police. On the phone, it was arranged for appellants to pick Washington up so that he could provide his statement at the police station.

At the police station, Washington participated in a voluntary interview with Detective Napolitano, who was the lead detective in the case, and his partner. Sergeant McGeough, who was the supervising officer, watched the interview intermittently on closed-circuit television. During the interview, Washington recounted what he had witnessed the prior night which, in sum and substance, is described above. According to Washington, he explained how he feared for his life during the incident and that he was not going to say "no" to Gaston while he had a gun pointed at him. He also identified Gaston from a photo line-up and

submitted to a gun residue kit, which was negative. Following a conversation with Sergeant McGeough regarding whether Washington felt safe to return home, appellants placed Washington in witness protection, where he remained for more than three months, unmonitored, until he was arrested.

Two days after Washington's interview, on May 19, 2016, Detective Napolitano drafted an arrest warrant affidavit for Gaston. To establish probable cause for Gaston's arrest, he relied on Washington's witness statement regarding what transpired in the car and video surveillance footage from the convenience store showing the three individuals getting into the car. The arrest warrant affidavit for Gaston contained a statement that the information contained therein was provided by witnesses (which included Washington) who were "prudent and credible." Joint App'x at 90. Based upon that affidavit, an arrest warrant was issued, charging Gaston with robbery in the first degree, murder, felony murder, and firearms-related offenses. (Gaston was not initially charged in the arrest warrant with conspiracy to commit robbery.) Gaston was arrested and, on June 7, 2016, Detective Napolitano interviewed him and found him to be untruthful.

## C.    Washington's Arrest and Prosecution

On June 7, 2016, Washington left a voicemail message with the State's Attorney's Office in Manchester stating he wanted his incarcerated girlfriend to be released or he would not continue to cooperate in the Gaston prosecution. Later that summer, in August, after Washington had been in witness protection, unmonitored for more than three months, both appellants participated in obtaining the arrest warrant for Washington – namely, Detective Napolitano drafted the arrest warrant affidavit and swore to it, and Sergeant McGeough reviewed and signed it as the individual administering the oath. According to appellants, the arrest warrant application, containing the affidavit, was prepared and submitted at the direction of the prosecutor. The arrest warrant affidavit for Washington contained no new information beyond what was already known at the time of Gaston's arrest. The warrant application was submitted to the Connecticut Superior Court and an arrest warrant was issued by the judge, charging Washington with felony murder, robbery in the first degree, and conspiracy to commit robbery in the first degree. A conspiracy count was similarly added to Gaston's charges.

On September 6, 2016, Washington voluntarily surrendered on the charges. It is undisputed that Washington learned that appellants had obtained a warrant for his arrest, that he then called Detective Napolitano, and that Washington and Detective Napolitano agreed that Washington could turn himself in to the police after the Labor Day weekend holiday. Washington claims that at the time of his arrest Detective Napolitano stated to him that "this is not our work," "not what we want," and obtaining the warrant was the "prosecutor's call." Joint App'x at 181–82.

In January 2017, after a probable cause hearing, the Connecticut Superior Court found no probable cause existed for the charge of felony murder (based upon the lack of probable cause for the robbery) and dismissed the felony murder charge. In July 2017, after a bench trial, Washington was acquitted of the remaining robbery and conspiracy charges. Washington had been in jail for almost one year.[3]

---

[3] Washington later testified as a witness at trial against Gaston who was found guilty of murder, felony murder, and robbery in the first degree on June 6, 2018. Gaston was acquitted on the conspiracy to commit robbery charge.

13

## II. PROCEDURAL HISTORY

In August 2017, Washington brought this lawsuit in which he asserted, as relevant here, false arrest and malicious prosecution claims. Appellants moved for summary judgment and argued, *inter alia*, that they were entitled to absolute prosecutorial immunity or, at a minimum, qualified immunity. The district court denied summary judgment, holding that absolute prosecutorial immunity did not apply and that there were genuine disputes as to material issues of fact, including on the issue of qualified immunity. More specifically, with respect to probable cause and qualified immunity, the court identified the following "relevant and exculpatory" information that was known to appellants and omitted from the arrest warrant affidavit for Washington:

- Washington stated that he was not aware that Gaston had a gun until Gaston pulled it out in the car, nor was he aware that Gaston would rob Wiggins.

- Washington reported that Gaston pointed the gun at Washington when he told Washington to take the victim's glasses.

- Washington also reported that Gaston had fired a warning shot in the car prior to that demand, and police found a bullet hole in the rear driver's side window.

- Washington had been placed in witness protection due to his fear of Gaston, at Sergeant McGeough's suggestion.

- Surveillance footage showed Washington initially walking towards his apartment and away from Gaston at the convenience store.

- Washington repeatedly told police of his shock, terror, and fear for his life during the events in the car.

- Washington believed Gaston would try to kill him too.

- After witnessing the Wiggins murder, Washington sought treatment at Hartford Hospital, and he was still wearing his hospital bracelet when he was interviewed by Detective Napolitano.

Special App'x at 18. The district court also noted that some aspects of Washington's exculpatory statements were corroborated by other evidence. For example, "[b]y the time Washington was arrested, the police had the corner store's security footage, which showed Gaston gesturing to Washington to come with him." *Id.* at 21. This supported Washington's statement that, when he left the

15

store, he initially had no intention of accompanying Gaston into Wiggins' car. In addition, the police had a photograph of Wiggins' car, displaying a bullet hole in the rear driver's side window, which supported Washington's contention that Gaston had fired a warning shot in the car before pointing the gun at him (Washington).

After reviewing the record, the district court concluded that summary judgment was precluded on the issue of probable cause. In particular, the district court explained that "[b]ecause some of the omitted information was relevant, questions of fact arise as to what weight a neutral magistrate would likely have given such information, and whether defendants acted deliberately or recklessly in omitting the information from the arrest warrants." *Id*. at 22.

Moreover, the district court concluded that "the omissions from the affidavit for Washington's arrest warrant application were relevant for finding arguable probable cause that Washington conspired with Gaston to commit first degree robbery," as it related to the qualified immunity inquiry. *Id.* at 24–25. In reaching this decision, the district court explained that much of the omitted information bore upon Washington's credibility:

> [S]everal of these omissions go to Washington's credibility: Washington's claim that he didn't know Gaston had a gun provides

16

corroborating detail to his claim that he had not planned to rob Wiggins; the corner store outdoor surveillance footage supports his claim that he had not made any agreement to rob Wiggins; the bullet hole in the rear side window of the car supports his claim that he had accepted Wiggins' possession in fear of his own life; and the hospital bracelet and offer of witness protection support his claim that he was scared and disturbed by the events in the car. The omission of this information creates additional questions of fact about what conclusions a reasonable officer or judicial official would draw as to Washington's credibility.

*Id*. at 25. In short, the district court held that, "[s]ince there are questions of fact as to arguable probable cause, the Court does not grant summary judgment on the basis of qualified immunity." *Id*.

This appeal followed.

## III. DISCUSSION

### A. Standard of Review and Jurisdiction

We review the district court's decision to grant summary judgment *de novo*, resolving all ambiguities and drawing all permissible factual inferences in favor of the non-moving party. *See Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012). Summary judgment is appropriate only when the movant demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See id.*

Moreover, although we may generally only hear appeals from "final decisions" of the district court, 28 U.S.C. § 1291, under the "collateral order doctrine," we may review a denial of summary judgment based on qualified immunity on an interlocutory basis if it may be resolved "on stipulated facts, or on the facts that the plaintiff alleges are true, or on the facts favorable to the plaintiff that the trial judge concluded the jury might find," *Salim v. Proulx*, 93 F.3d 86, 90 (2d Cir. 1996). However, in this Circuit, interlocutory appeals may not be taken from denials of qualified immunity "[i]f resolution of the immunity defense depends upon disputed factual issues." *DiMarco v. Rome Hosp. & Murphy Mem'l Hosp.*, 952 F.2d 661, 665 (2d Cir. 1992). The same is true for a denial of absolute immunity. *See Nixon v. Fitzgerald*, 457 U.S. 731, 742–43 (1982); *accord San Filippo v. U.S. Tr. Co. of N.Y.*, 737 F.2d 246, 248 (2d Cir. 1984). Nevertheless, this Court's appellate review "extends to whether a given factual dispute is 'material' for summary judgment purposes." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004).

## B. Absolute Immunity

Appellants contend that they are entitled to absolute prosecutorial immunity for their involvement in the arrest warrant application and affidavit

18

charging Washington because they acted at the direction of the prosecutor. We disagree.

In determining whether absolute prosecutorial immunity applies, courts must take a "'functional approach,' looking to the function being performed rather than to the office or identity of the defendant." *Hill v. City of New York*, 45 F.3d 653, 660 (2d Cir. 1995) (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)). In *Malley v. Briggs*, the Supreme Court explicitly rejected the contention that a police officer should have absolute immunity for submitting a complaint and supporting affidavit to a court in order to obtain an arrest warrant and, instead, held that such a function is only protected by qualified immunity. 475 U.S. 335, 342–43 (1986). Contrary to appellants' argument, the fact that a prosecutor may have directed the officers to perform this police function does not alter the analysis. We recognize that absolute immunity extends not only to prosecutors "performing discretionary acts of a judicial nature, but also [to] individual employees who assist such [prosecutor] and who act under that [prosecutor's] direction in performing functions closely tied to the judicial process." *Hill*, 45 F.3d at 660 (citation omitted). However, swearing to arrest warrant affidavits and executing arrests are not "functions closely tied to the judicial process." *Id*. For example, in *Simon v. City of*

19

*New York*, we held that the officers there were not entitled to absolute immunity for following a prosecutor's instruction in executing a material witness warrant. 727 F.3d 167, 174 (2d Cir. 2013). Similarly, in the instant case, the prosecutor's direction to obtain an arrest warrant for an individual does not transform a police officer's action, in swearing to the arrest warrant affidavit or participating in the arrest, into a prosecutorial act cloaked with absolute immunity. In fact, the Supreme Court has made clear that, if a prosecutor acts as a complaining witness by testifying to the evidentiary basis for an arrest warrant application, "the only function that she performs in giving sworn testimony is that of a witness," and absolute immunity cannot extend even to a prosecutor in such a situation.[4] *Kalina v. Fletcher*, 522 U.S. 118, 131 (1997). Accordingly, the district court correctly held that absolute prosecutorial immunity does not apply to the alleged conduct

---

[4] Appellants point to *O'Neal v. Morales*, 679 F. App'x 16 (2d Cir. 2017), in which absolute immunity applied on the ground that the conduct at issue involved an officer confirming a discrete fact for a prosecutor that was relevant to a witness's testimony in an imminent trial. However, unlike here, the investigative activity in *O'Neal* was "in furtherance of the advocacy function of preparing for judicial proceedings" and thus was "intimately associated with the judicial phase of the criminal process." *Id*. at 18 (internal quotation marks omitted).

regarding the arrest warrant affidavit by appellants, and that such conduct is properly analyzed under the qualified immunity standard.[5]

## C. Qualified Immunity

Appellants also argue that "the district court erred in concluding that purported omissions from the affidavit for plaintiff's arrest defeated probable cause, or at the very least, arguable probable cause such that the defendants were not entitled to qualified immunity." Appellants' Br. at 1. Before addressing the

---

[5] Although any advice or direction from the prosecutor regarding the arrest does not support *absolute immunity* for appellants, there is the separate question of whether there are circumstances under which reliance on counsel may be considered in connection with the doctrine of *qualified immunity*. *See Taravella v. Town of Wolcott*, 599 F.3d 129, 135 n.3 (2d Cir. 2010) ("We need not decide whether reliance on legal advice constitutes an 'extraordinary circumstance' sufficient by itself to give rise to qualified immunity, because at the very least the solicitation of legal advice informs the reasonableness inquiry." (citation omitted)). *But see In re County of Erie*, 546 F.3d 222, 229 (2d Cir. 2008) (holding that the separate question of "whether a right is 'clearly established' is determined by reference to the case law extant at the time of the violation" and that "[t]his is an objective, not a subjective test, and reliance upon advice of counsel therefore cannot be used to support the defense of qualified immunity"). However, we need not – and do not – address that issue here because appellants did not make this specific argument as it relates to qualified immunity and, in any event, the record is unclear as to whether appellants supplied the exculpatory details to the prosecutor before receiving any such advice or direction.

evidence in the record, we briefly summarize the legal standards for probable cause and qualified immunity.

Probable cause constitutes an absolute defense to a false arrest claim, *see Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995), and similarly defeats a claim for malicious prosecution, *see Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014). Our probable cause analysis looks to the law of the state where the arrest and prosecution occurred. *See Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004). The probable cause standard under Connecticut law and federal law are substantively identical, requiring a showing that "officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (internal quotation marks omitted). The existence of probable cause depends on the totality of the circumstances. *See Dufort v. City of New York*, 874 F.3d 338, 348 (2d Cir. 2017). In addition, "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997); *see also Krause v. Bennett*, 887

22

F.2d 362, 372 (2d Cir. 1989) ("It would be unreasonable and impractical to require that every innocent explanation for activity that suggests criminal behavior be proved wrong, or even contradicted, before an arrest warrant could be issued with impunity.").

When an official raises qualified immunity as a defense, the court must consider, pursuant to the two-step framework articulated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), whether: "(1) . . . the official violated a statutory or constitutional right, and (2) . . . the right was 'clearly established' at the time of the challenged conduct." *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). An arresting officer is entitled to qualified immunity even if probable cause is lacking "so long as 'arguable probable cause' was present when the arrest was made." *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016). "A police officer has arguable probable cause 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on

whether the probable cause test was met.'" *Id*. (quoting *Zalaski v. City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013)).

Moreover, as relevant here, it is well settled that "the issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause," such that the officers are entitled to qualified immunity. *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991). To overcome this presumption, a plaintiff must show that the officers knowingly or recklessly omitted material information from the warrant affidavit. *See Mara v. Rilling*, 921 F.3d 48, 73 (2d Cir. 2019). In other words, "[w]here an officer knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause, as where a material omission is intended to enhance the contents of the affidavit as support for a conclusion of probable cause, the shield of qualified immunity is lost." *Golino*, 950 F.2d at 871 (internal citations omitted).

In assessing materiality, we "consider a hypothetical corrected affidavit, produced by deleting any alleged misstatements from the original warrant affidavit and adding to it any relevant omitted information." *Ganek v. Leibowitz*, 874 F.3d 73, 82 (2d Cir. 2017). If the corrected affidavit provides an "objective basis

to support arguable probable cause, remaining factual disputes are not material to the issue of qualified immunity and summary judgment should be granted to the defendant on the basis of qualified immunity." *Escalera*, 361 F.3d at 744. Materiality is a mixed question of law and fact such that "[t]he legal component depends on whether the information is relevant to the probable cause determination under controlling substantive law." *Velardi v. Walsh*, 40 F.3d 569, 574 (2d Cir. 1994). Once the concealed information is determined by the court to be relevant, then "questions of fact may arise as to what weight a neutral magistrate would likely have given such information, and whether defendants acted deliberately or recklessly in omitting the information from the warrant affidavits." *Walczyk*, 496 F.3d at 158 (internal quotation marks, alterations, and citations omitted). We have emphasized that "[e]ven in such circumstances, however, a court may grant summary judgment based on qualified immunity where the evidence, viewed in the light most favorable to the plaintiffs, discloses no genuine dispute that a magistrate would have issued the warrant on the basis

25

of the corrected affidavits." *Id*. (internal quotation marks, citations, and emphasis omitted).

Applying that standard here, the district court outlined portions of Washington's statement that were omitted from the arrest warrant affidavit that it concluded were not immaterial as a matter of law to the probable cause analysis. Appellants argue that the district court erred because "[t]he facts and circumstances not subject to dispute on the record before the district court show 'beyond doubt that [the] plaintiff can prove no set of facts' even under a corrected warrant analysis by which to rebut the presumption of probable cause flowing from the duly issued warrant for his arrest." Appellants' Br. at 27 (quoting *Kass v. City of New York*, 864 F.3d 200, 206 (2d Cir. 2017)). We disagree. As discussed below, construing the evidence most favorably to Washington, we cannot conclude, at the summary judgment stage, that the omitted information was immaterial as a matter of law to the probable cause determination. The district court correctly concluded that disputed issues of material fact precluded

resolution of the qualified immunity question at this stage of the proceeding for several reasons.[6]

*1. Omitted Exculpatory Information.* A substantial portion of the information omitted from Washington's statement was relevant and clearly exculpatory in nature, including the following assertions: (1) Washington did not know Gaston had a gun nor that Gaston intended to rob Wiggins; (2) Gaston pointed the gun at Washington when he told Washington to take the victim's glasses; (3) Washington did not realize he still had the glasses in his hand when he fled the car; and (4) Washington believed Gaston would try to kill him too. To the extent appellants suggest that such exculpatory evidence cannot impact the probable cause analysis because duress is an affirmative defense, we find that argument unpersuasive. As

---

[6] Appellants suggest that "it was not clearly established that the omitted information needed to be contained in the warrant." Appellants' Br. at 31. That is incorrect. As noted *supra*, at the time of the relevant events in this case, it was well established under Second Circuit law that "an officer may not disregard plainly exculpatory evidence," *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006), including facts establishing a defense, *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003), and fail to disclose those materially exculpatory facts to the judge issuing the warrant, *see Golino*, 950 F.2d at 872 ("Given . . . the evidence that appellants' nondisclosure of the exculpatory information was deliberate, the district court properly concluded it could not rule as a matter of law that it was objectively reasonable for appellants to believe there was probable cause for the arrest and prosecution of [plaintiff]. Summary judgment was properly denied."). Thus, our inquiry focuses on whether the omitted information was immaterial to the probable cause determination as a matter of law, such that qualified immunity should attach in this case at the summary judgment stage.

27

a threshold matter, if these exculpatory statements by Washington were deemed credible, he would have lacked the requisite intent to be part of any robbery conspiracy, regardless of any potential duress defense. In any event, this is one of the circumstances under which "a police officer's awareness of the facts supporting a defense can eliminate probable cause." *Jocks*, 316 F.3d at 135 (concluding that probable cause may be defeated if the officer "deliberately disregard[s] facts known to him which establish justification").

To be sure, we have held that an "officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause," *Panetta*, 460 F.3d at 396, as "[i]t is up to the factfinder to determine whether a defendant's story holds water, not the arresting officer," *Krause*, 887 F.2d at 372. But we have also consistently held, as relevant here, that "an officer may not disregard plainly exculpatory evidence." *Panetta*, 460 F.3d at 395.

Here, it is uncontroverted (from the police paperwork) that appellants already possessed knowledge of the exculpatory information and Washington asserts that, by omitting the exculpatory information in the arrest warrant affidavit, appellants deprived the judge of the fair ability to make the necessary assessment of whether the "story holds water" for probable cause purposes.

28

Moreover, although appellants seek to argue the immateriality of the omissions one-by-one, we must consider those omissions "*as a whole* in determining if probable cause continues to exist." *United States v. Marin-Buitrago*, 734 F.2d 889, 895 (2d Cir. 1984) (emphasis added); *see also Andrews v. Scuilli*, 853 F.3d 690, 703 n.16 (3d Cir. 2017) ("[T]here may be instances when no single omission or misrepresentation is sufficient to defeat a finding of probable cause, but the combined effect of the omissions and misrepresentations suffices to call into question the reliability of the affiant and the affiant's witnesses such that the question of probable cause cannot be resolved on a summary judgment motion.").

*2. Materiality.* It is central to the materiality of Washington's omitted statements that his police interview was the cornerstone of the arrest warrant affidavit and the only basis of appellants' ability to demonstrate probable cause. Other than corroborating that Washington and Gaston met Wiggins at the convenience store with surveillance footage, the affidavit's only evidence of Washington's presence at the robbery is his own statements. Even though the affidavit generally notes Washington's purported lack of knowledge regarding the incident, it omits the details that account for why his presence was innocent. This is not a case where probable cause was firmly based on substantial other evidence

(such as a victim's statement, an eyewitness account, and/or forensic evidence) independent of a defendant's statement to the police, such that the details of the defendant's denial could not have possibly been material to the judge's determination of probable cause. Where a witness statement is the lynchpin of the probable cause analysis, the materiality of one or more omissions from that witness's interview may be magnified.

*3. Context.* The affidavit also specifically used a piece of Washington's own statement to rebut his denial of knowledge without providing the critical context. In particular, the affidavit explains:

> Washington stated that he had no knowledge of the intended robbery and stated that Gaston acted on his own, however, Washington admitted to running away with the victim's stolen sunglasses and acknowledged that he watched Gaston point a gun at Wiggins and order Wiggins to hand over his property. Washington was sitting in the back seat of the vehicle and could have exited the vehicle if he truly had no part in the robbery.

Joint App'x at 95. Thus, the affidavit utilizes Washington's admissions, that he ran away with the victim's sunglasses and that he stayed in the back seat during the robbery, to establish his intent and rebut his denial of knowledge of the robbery without advising the judge that, among other things, Washington also stated that Gaston pointed the gun *at Washington* (not Wiggins) when he told the victim to

30

hand Washington the glasses; that Gaston fired a warning shot into the backseat (as corroborated by the officers finding a bullet hole in the rear passenger door – another omitted fact); and that Washington was so afraid that he did not realize the glasses were in his hand as he fled the car.

Appellants assert that the inclusion in the affidavit of Washington's general denial was sufficient for the neutral magistrate judge "to weigh that information against the other information contained in the warrant." Appellants' Br. at 20–21. That assertion, however, overlooks that there are undeniably circumstances where, as here, omitting the details of the defendant's statement and simply noting a general denial of guilt in the affidavit could deprive the judge of information necessary both to properly evaluate and to weigh the reliability of the statement and potentially impact the outcome of the probable cause determination. For example, if a police officer simply notes in an affidavit that the defendant admitted to taking money from a bank's safe during a robbery but denied any involvement in the robbery, the judge could not properly examine the weight to be given to that statement for probable cause purposes, without knowing that the defendant also told the police that he was an employee of the bank and had delivered the money

31

to the robbers at gunpoint.  In short, the context of a statement may make all the difference.

The statement that Washington took the glasses from Wiggins is contextually distinct from the statement that he did so *after Gaston pointed the gun at Washington*.  The dissent concludes that this additional fact – that Gaston was pointing the gun at Washington when Washington took the glasses from the victim – is "a rather minor detail in the context of what the Officers disclosed." *Post* at 4.  We respectfully disagree.  As we have held, although "the law does not demand that an officer applying for a warrant volunteer every fact that arguably cuts against the existence of probable cause," the officer must "not omit circumstances that are critical to its evaluation."  *Walczyk*, 496 F.3d at 161 (internal quotation marks and citation omitted); *see also Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir. 2000) (emphasizing that "[w]e cannot demand that police officers relate the entire history of events leading up to a warrant application with every potentially evocative detail that would interest a novelist or gossip," but also noting that "a police officer cannot make unilateral decisions about the materiality

of information, or, after satisfying him or herself that probable cause exists, merely inform the magistrate or judge of inculpatory evidence").[7]

To the extent that appellants and the dissent suggest that our decision means that a police officer must include every detail from a suspect's statement in an arrest warrant affidavit, that is not our holding. We hold only that factual

---

[7] The dissent's reliance on our decision in *Krause*, *post* at 6, is misplaced. In *Krause*, there was no issue as to whether the officer had omitted any material fact from the arrest warrant application seeking to charge Krause with possession of stolen property. *See* 887 F.2d at 365–67. Instead, as to Krause's purported lack of knowledge that the traffic sign hanging in his garage was stolen, the warrant application specifically disclosed that "[t]he defendant made an oral statement that he had this sign for about three or four years" and that he "also stated he received this sign from a friend." *Id*. at 366. In short, there was *no claim* by Krause of any improper omission of facts in the warrant application; rather, the question was whether the officer (and the judge) had sufficient evidence of probable cause to infer knowledge of the stolen nature of the stop sign based upon the information possessed by the officer and disclosed to the judge at the time of Krause's arrest. *Id*. at 369–70 ("Krause's argument on appeal focuses on the reasonableness of [the officer's] belief that Krause *knowingly* possessed stolen property. To a lesser extent, Krause also questions whether the information presented to the town justice who signed the arrest warrant was sufficient to infer that Krause possessed the requisite knowledge."). Thus, *Krause* is inapposite to the circumstances here regarding the omission of potentially material facts from the arrest warrant affidavit for Washington.

details must be included where, as here, they may be critical to the assessment of

probable cause for the arrest warrant by the issuing judge.[8]

*4. Credibility Assessment.* Beyond the omission of the exculpatory details of

Washington's statement from the arrest affidavit, there is also a material question

of whether appellants had, in fact, credited Washington's exculpatory statement.

We have emphasized that an assessment reached by a police officer as to the

credibility or reliability of a particular witness not only may be considered as part

of the objective probable cause analysis, but may often be crucial. *See McColley v.*

*County of Rensselaer*, 740 F.3d 817, 825 (2d Cir. 2014) ("A confidential informant's

credibility is plainly relevant – even critical – to the probable cause

---

[8] The dissent argues that "it is hard to imagine that these so-called omissions, taken in the context with the disclaimers actually contained in the affidavit, would have made any difference to the magistrate's probable-cause determination." *Post* at 4–5. As an initial matter, to the extent the dissent points to what it views as "internally inconsistent deposition testimony," *id.* at 5, any such inconsistencies are legally irrelevant to the probable cause determination at the time of Washington's arrest. In any event, it should not be difficult to imagine how the omissions could have affected the probable cause determination because, when the court was actually presented with Washington's full exculpatory explanation at a hearing following his arrest, it found *no probable cause* to believe Washington was guilty of robbery and dismissed the felony murder charge. *See* Joint App'x at 898–901 ("The issue is whether there is probable cause to believe the accused, while acting with Michael Gaston, committed a robbery. . . . After consideration of the state's evidence, with its reliance on the accused's written statement, and the totality of the circumstances, the Court finds that the State failed to establish probable cause to require the defendant to be put on trial for the crime of Felony Murder as charged.").

34

determination."). Although an officer's motivation for an arrest (or a subjective belief as to whether probable cause exists) is irrelevant to the legal determination of probable cause, *see Golino*, 950 F.2d at 82; *accord Arkansas v. Sullivan*, 532 U.S. 769, 771–72 (2001), an officer's credibility assessment of a witness whose statement is relied upon is a "fact[] known to the [warrant] applicant" potentially material to the probable cause analysis.[9] *McColley*, 740 F.3d at 823.

For example, it is well settled that an officer can rely upon a statement by a putative victim or eyewitness to establish probable cause unless the officer has reason to doubt the witness's veracity. *See Panetta*, 460 F.3d at 395. Thus, our cases

---

[9] The dissent suggests that, even when an officer has reached a conclusive assessment of the credibility of a witness that would undermine the statement of that witness being presented in the warrant application to support probable cause, the officer can conceal that credibility assessment because "those views are entitled to no weight in the magistrate's probable-cause determination" and "they merit no attention on appeal." *Post* at 9. We respectfully disagree. As the above-referenced precedent makes clear, credibility assessments are part of the probable cause determination and, thus, the officer would need to disclose any credibility assessment reached by the officer that *undermined* the very witness statement upon which he or she was basing probable cause in the affidavit (and also disclose the basis for that credibility assessment). In any event, the dissent does acknowledge that the officers would need to disclose the material facts in the warrant application that would allow the court to make its own credibility determination as to that statement by the witness in such a situation. *See id*. at 8 (recognizing that officers are required to disclose "objective facts and information that might bolster or diminish a suspect's (or informant's) credibility *in the eyes of the issuing magistrate*"). As discussed *supra*, we independently conclude that there are issues of fact that preclude summary judgment on whether appellants sufficiently disclosed the material facts about Washington's statement that would have allowed the magistrate judge to properly assess the credibility of his exculpatory statement.

often focus on whether the officer concealed information from the judge that tended to show that a particular witness lacks credibility. *See Ganek*, 874 F.3d at 87 (explaining that "a warrant issuance question might arise where the credibility of certain evidence (*e.g.*, from a source with a motive to lie), or the sufficiency of corroboration (*e.g.*, for an anonymous tip) informs a probable cause determination"). Here, the credibility issue flows in the opposite direction – namely, whether appellants had in fact assessed Washington's exculpatory explanation as credible and knowingly concealed that credibility assessment, as well as the underlying details of the exculpatory explanation itself, from the judge issuing the warrant – but remains relevant to the objective probable cause analysis.

Construing the evidence most favorably to Washington, a rational jury could find that, at the time the affidavit was signed and submitted to the judge for Washington's arrest, appellants had found credible the entirety of Washington's statement, including his exculpatory explanation. Washington has pointed to the following evidence: (1) on May 18, 2016, which was the date after his police interview, Washington was placed in witness protection and remained there for several months without being charged with any crime and without monitoring; (2) on May 19, 2016, an arrest warrant affidavit for Gaston was prepared by

36

Detective Napolitano based on Washington's statement and contained references to the "prudent and credible" witnesses upon which Detective Napolitano had relied, which necessarily included Washington, Joint App'x at 90; (3) the record contains no evidence of any information obtained by appellants that contradicted or undermined Washington's version of the events between the time he volunteered his statement in May 2016 and his arrest in August 2016 (and the arrest warrant affidavit for Washington was substantially identical to the affidavit for Gaston); (4) Detective Napolitano allegedly stated to Washington when he was being arrested and charged that "this is not our work," "not what we want," and obtaining the warrant was the "prosecutor's call," Joint App'x at 181–82;[10] and (5) Washington, even after his arrest (and the subsequent unsuccessful prosecution against him), was put on the witness stand by the prosecutor to testify at Gaston's trial. Appellants counter that "the fallacy that the defendants believed plaintiff when he stated he was not aware of or involved with Gaston's decision to rob and murder Marshall Wiggins" is "soundly contradicted by record evidence," Appellants' Reply Br. at 4, by pointing to their own deposition testimony (in which

---

[10] Detective Napolitano acknowledged that it is possible he told Washington that the warrant was "bogus," but explained that any such statement was only to gain Washington's confidence, as he was a potential witness. Joint App'x at 312–13.

they stated that they believed Washington was culpable in the robbery) and arguing that such testimony "compels a finding" in their favor on this issue, Appellants' Reply Br. at 6. We disagree and conclude, notwithstanding appellants' deposition testimony, that there is sufficient evidence to create a material issue of fact as to whether appellants did find his exculpatory explanation credible.

Rather than address these facts collectively, drawing all reasonable inferences in Washington's favor (as the law requires us to do), the dissent selectively isolates particular facts to conclude that each such fact is insufficient to infer that the appellants found Washington's exculpatory evidence to be credible. For example, the dissent characterizes Detective Napolitano's statements to Washington at the time of the arrest as "innocuous" and as "not remotely suggest[ing] that the Officers believed they were arresting an innocent man." *Post* at 12. The dissent fixes on our brief mention (in outlining Washington's evidence above) of his placement in the witness protection program and belabors the fact that mere placement of an individual in witness protection does not mean the police believe that the individual is innocent. *Id.* at 11–12. Of course, we make no suggestion to the contrary. More generally, we examined these facts cumulatively,

rather than in isolation, applying the requisite "totality of the circumstances" analysis. As we have emphasized:

> The totality of the circumstances test is no mere formality; it may frequently alter the outcome of a case. Those who do not take into account conditional probability are prone to making mistakes in judging evidence. They may think that if a particular fact does not itself prove the ultimate proposition (e.g., whether the officer had probable cause), the fact may be tossed aside and the next fact may be evaluated as if the first did not exist. The significance of each relevant factor may be enhanced or diminished by surrounding circumstances. Review for probable cause should encompass plainly exculpatory evidence alongside inculpatory evidence to ensure the court has a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest. A story is never a single chapter, it is the experience of the entire tale; the same is true of probable cause.

*Stansbury v. Wertman*, 721 F.3d 84, 92–93 (2d Cir. 2013) (Wesley, *J.*) (internal quotation marks, alterations, and citations omitted).

It is the combination of all the facts in relation to each other (outlined *supra* and in the district court's opinion), while drawing all inferences in Washington's favor, that creates the issue of fact as to whether the appellants found Washington's exculpatory statement credible and lacked probable cause, but charged him anyway (and concealed their positive credibility assessment in the warrant application, along with certain facts that would have allowed the

magistrate judge to independently make that assessment) in the warrant application.

The failure to disclose that positive credibility assessment, assuming a jury determines such an assessment was reached as to Washington by appellants, is even more problematic because the affidavit goes so far as to cast doubt upon the witness's truthfulness by stating that "Washington was sitting in the back seat of the vehicle and *could have exited the vehicle if he truly had no part in the robbery*." Joint App'x at 95 (emphasis added). Obviously, if appellants had found Washington's exculpatory explanation credible, the affidavit should not misleadingly suggest otherwise.

In any event, assuming that appellants in fact found Washington's explanation lacking in credibility as suggested in the affidavit, Washington's ability to exit the car during the incident is directly contradicted by his relevant and exculpatory statement to officers – omitted from the arrest warrant affidavit – that Gaston pointed a gun at him and Gaston had already fired that gun inside the vehicle. *See* Joint App'x at 99. Thus, as discussed *supra*, there is a question, at minimum, as to whether appellants offered to the magistrate judge their own subjective, personal assessment of the credibility of Washington's denial based

40

upon a particular fact (namely, Washington's failure to leave the car when the robbery began), while failing to include other critical details surrounding that fact that would allow the neutral magistrate judge to weigh that fact in assessing the credibility of Washington's denial.

*  *  *

In sum, the disputed issues of material fact, including on the issue of whether appellants found Washington's exculpatory statements to be fully credible, preclude summary judgment on whether arguable probable cause existed – that is, "whether officers of reasonable competence could disagree on whether the probable cause test was met" in this particular factual context. *Escalera*, 361 F.3d at 746; *see also Walczyk*, 496 F.3d at 163–64 ("Because a resolution of some of these [disputed] matters in favor of [the plaintiff] could preclude one or more defendants from claiming they acted with arguable probable cause . . . , the district court correctly concluded that defendants did not yet establish their entitlement to qualified immunity."). Given that the probable cause for Washington's arrest was based almost entirely on Washington's statement, no

reasonable officer would have believed probable cause existed for Washington's arrest if Washington's exculpatory explanation was deemed credible.

"The exact weight that the judge would have given this information remains a question of fact that prevents this Court from exercising jurisdiction over the district court's denial of summary judgment on the claim of qualified immunity." *McColley*, 740 F.3d at 825; *see also Velardi*, 40 F.3d at 574 ("[T]he weight that a neutral magistrate would likely have given such information is a question for the finder of fact, so that summary judgment is inappropriate in doubtful cases."). We express no view as to how these factual disputes may be resolved at trial, and only conclude that the district court properly denied qualified immunity at the summary judgment stage.

## IV. CONCLUSION

For the foregoing reasons, the order of the district court is **AFFIRMED**, and the case is **REMANDED** for further proceedings consistent with this opinion.

RICHARD J. SULLIVAN, *Circuit Judge*, dissenting:

Although I agree with the majority that Detective Frank Napolitano and then-Sergeant Francis McGeough (the "Officers") are not entitled to absolute prosecutorial immunity, I believe that they *are* entitled to summary judgment based on qualified immunity because there was at least arguable probable cause to arrest Laurence Washington for robbery.

The majority concludes first that the affidavit accompanying the warrant for Washington's arrest may have omitted relevant and exculpatory facts sufficient to defeat the presumption of probable cause that an arrest warrant ordinarily carries. *See Mara v. Rilling*, 921 F.3d 48, 73 (2d Cir. 2019). Chief among these supposed omissions is the nondisclosure of whether the Officers subjectively believed Washington's protestations of innocence. The majority further holds that, were we to "correct" the deficient affidavit by supplying the supposedly missing information, there is a question of fact as to whether even *arguable* probable cause would have supported Washington's arrest. *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016) (explaining that police officers are immune from wrongful-arrest suits "so long as 'arguable probable cause' was present when the arrest was made") (citation omitted). In my view, the Court falters at both steps, and in the process

1

muddies the longstanding rule that the probable-cause inquiry is objective and does not depend on police officers' subjective motivations or views.

The undisputed facts are these: Laurence Washington admitted to the police that he was in the vehicle when Michael Gaston held Marshall Wiggins at gunpoint, that he had been with Gaston shortly before they entered the car with Wiggins, that he and Gaston were seeking to procure marijuana from Wiggins (who was a marijuana dealer), that he took Wiggins's glasses and jewelry and removed them from the car during the robbery, that he then disposed of Wiggins's property as he was running away from the car, and that he changed his clothes after the robbery. Many of those details were later corroborated by video and physical evidence. These admissions plainly gave the Officers "knowledge or reasonably trustworthy information . . . sufficient to warrant a person of reasonable caution in the belief that [Washington] ha[d] committed . . . a crime." *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (citation omitted).

The majority nevertheless insists that the Officers may have submitted a misleading affidavit because they (putatively) failed to include in the affidavit Washington's claims of innocence and lack of knowledge concerning Gaston's plan to rob Wiggins. But the law is clear that "[o]nce a police officer has a

reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997). Moreover, the affidavit submitted to the magistrate *did* disclose Washington's assorted disclaimers and assertions of innocence, including that it was Washington who initiated contact with the police to discuss the shooting; that Washington claimed to have screamed at Gaston when he drew a weapon on Wiggins in the car, yelling "that [Gaston] was crazy and that [Washington] wanted no part in this," J. App'x at 94; that Washington told the Officers "that he was scared, and could not believe what was happ[en]ing," J. App'x at 94; and that Washington asserted "he had no knowledge of the intended robbery and . . . that Gaston acted on his own," J. App'x at 95.

Notwithstanding these disclosures, the majority contends that the affidavit should also have provided more detailed descriptions of Washington's disclaimers, including his assertions that he did not know that Gaston had a gun or intended to rob Wiggins; that Gaston pointed the gun at Washington during the robbery; that Washington did not realize he still had Wiggins's possessions in his

3

hand when he exited the car; and that Washington thought Gaston was going to kill him, too. Maj. Op. at 27.

But these "omissions" are either immaterial to the assessment of probable cause, or else redundant in light of what the Officers did disclose. For instance, Washington's claim that he did not know Gaston either had a gun or intended to rob Wiggins is indistinguishable from the affidavit's disclosures that Washington claimed to have no knowledge of the intended robbery and that he cried out in alarm and terror when Gaston drew his gun on Wiggins. If anything, the affidavit's vivid description of Washington's incredulous exclamations upon Gaston's drawing his weapon is *more* helpful to his claim of innocence than a rote assertion that he claimed not to know that Gaston had a gun. *Cf.* Maj. Op. at 30–32 (describing the importance of supplying relevant context and details in the affidavit).

And while the majority makes much of Washington's assertion that Gaston pointed the gun in a threatening manner at him during the robbery, Maj. Op. at 9–10, 30–32, this, too, is a rather minor detail in the context of what the Officers disclosed. Moreover, Washington's blatantly inconsistent descriptions of this incident also severely undermine its exculpatory value: his contemporaneous

4

police statement avers that Gaston pointed the gun at him only when Gaston "order[ed] [Wiggins] to give [Washington] his glasses and rings," J. App'x at 99, as if indicating that Wiggins should hand his valuables to Washington as Gaston's ostensible accomplice; his internally inconsistent deposition testimony asserted both that he told the Officers that Gaston was pointing the gun at him "at all times," J. App'x at 240, but also seemingly that Gaston was pointing it back and forth in an attempt to hold Wiggins and Washington at gunpoint simultaneously, J App'x at 149–50. Even buoyed by the deference owed on summary judgment to Washington's factual narrative, the majority can't explain why this inconsistently recounted detail was so compelling that it required the Officers not just to believe (some version of) it, but also to disclose it in their affidavit as a fact "critical to [the probable-cause] evaluation." *Walczyk*, 496 F.3d at 161 (citation omitted).

In sum, it is hard to imagine that these so-called omissions, taken in context with the disclaimers actually contained in the affidavit, would have made any difference to the magistrate's probable-cause determination.[1] Our cases reinforce

---

[1] To refute this point, the majority surprisingly relies on the fact that, after a hearing, a Connecticut judge declined to find probable cause to try Washington for felony murder. *See* Maj. Op. at 34 n.8. But that determination is wholly beside the point for purposes of this appeal. At a Connecticut probable cause hearing, "[t]he accused person shall have the right to counsel and may attend and[] . . . participate in such hearing, present argument to the court, [and] cross-examine witnesses against him." Conn. Gen. Stat. § 54-46a(b). Plainly, the conclusion reached by

5

the point that we ordinarily require far more before undertaking a corrected affidavit analysis. For instance, in *Golino v. City of New Haven*, we conducted a corrected affidavit analysis when the officers failed to disclose that the suspect they sought to arrest looked nothing like the man described by eyewitnesses as the killer and that the suspect's fingerprints did not match a set, believed to belong to the killer, that was found on the victim's car. 950 F.2d 864, 867 (2d Cir. 1991). Meanwhile, in *Krause v. Bennett*, we granted qualified immunity to the arresting officer even though the officer had failed to disclose that the plaintiff, who was charged with receipt of a stolen traffic sign found in his garage, had given specific details about how he came into possession of the sign; in fact, the warrant application in *Krause* made no mention whatsoever of the plaintiff's *general denial* of knowledge that the sign was stolen. 887 F.2d 362, 365–66 (2d Cir. 1989).

Even reading the omissions in this case expansively, they plainly fall closer to those in *Krause* than *Golino.* And this case certainly bears no resemblance to the hypothetical offered by the majority, in which "an affidavit [discloses] that the defendant admitted to taking money from a bank's safe during a robbery but [omits that] the defendant also told the police that he was an employee of the bank

---

a judge after that process sheds no light on the magistrate's probable cause determination, what the Officers should have disclosed to the magistrate, or anything else relevant to this case.

6

and had delivered the money to the robbers at gunpoint." Maj. Op. at 31–32. Put differently, if these omissions are enough to land the Officers in corrected affidavit territory, it is difficult to see what remains of our longstanding rule that "the law does not demand that an officer applying for a warrant 'volunteer every fact that arguably cuts against the existence of probable cause.'" *Walczyk*, 496 F.3d at 161 (quoting *Brown v. D'Amico*, 35 F.3d 97, 99 (2d Cir. 1994)).

That leaves us with the one omission on which the majority's holding necessarily hinges – the Officers' failure to profess their own subjective belief as to the veracity of Washington's statements in the affidavit. The majority concludes that the Officers might have believed Washington's protestations of innocence, and it holds that they should have disclosed as much. Maj. Op. at 34–40. But the majority's reliance on the Officers' credibility assessment is misplaced for the simple reason that we have *never* required law enforcement affiants to offer their subjective views of the evidence in warrant applications. That is no doubt because "the probable cause inquiry is based upon whether the facts known by the arresting officer at the time of the arrest *objectively* provided probable cause to arrest." *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006) (emphasis added). Our case law accordingly stresses that the justification for an arrest is measured solely

7

against the "*facts*" or the "*information*" available to a police officer at the time of arrest. *See, e.g., Devenpeck v. Alford*, 543 U.S. 146, 153 (2004); *Figueroa*, 825 F.3d at 99; *Jaegly*, 439 F.3d at 153; *Escalera v. Lunn*, 361 F.3d 737, 744 (2d Cir. 2004).

The concepts of "facts" and "information" do not encompass an *officer's* subjective assessment of a suspect's credibility. Rather, they are limited to the objective facts and information that might bolster or diminish a suspect's (or informant's) credibility *in the eyes of the issuing magistrate*. The very cases the majority cites illustrate the point. *See, e.g., McColley v. County of Rensselaer*, 740 F.3d 817, 825 (2d Cir. 2014) (Maj. Op. at 34–35) (holding that it was a material omission for police not to disclose the *events* and *information* that "fail[ed] to corroborate a confidential informant's account"). The majority's attempt to fit an officer's subjective credibility assessment into our objective probable-cause paradigm is belied by its failure to cite a single case that places any weight upon how officers "had in fact" assessed someone's credibility. Maj. Op. at 36. At most, the Officers were obligated to disclose whether independent corroboration of Washington's account existed – as they did by informing the magistrate that physical evidence and video corroborated aspects of Washington's story.

8

The objective nature of the probable-cause inquiry is a longstanding feature of our case law, and I fear that the majority's holding will effectively require law enforcement officers to announce their subjective views as to each fact or statement presented in an affidavit. Indeed, if "an officer's credibility assessment . . . is a 'fact known to the warrant applicant,'" then so are officers' views of every aspect of the case. Maj. Op. 35 (citation omitted) (alterations adopted). Since those views are entitled to no weight in the magistrate's probable-cause determination, they merit no attention on appeal.[2]

But even if the subjective beliefs of the Officers could be deemed relevant to the magistrate's probable-cause determination, they would bear upon the Officers' liability only if the Officers actually believed Washington *was* innocent. And on that point, I remain unpersuaded that "there is . . . a material question of whether [the Officers] had, in fact, credited Washington's exculpatory statement," Maj. Op. at 34, i.e., that "a rational jury could find that, at the time the affidavit was signed and submitted to the judge for Washington's arrest, [the Officers] had found

---

[2] The majority attributes to me the view that an officer can "conceal" a "conclusive assessment of the credibility of a witness," Maj. Op. at 35 n.9, as if there is something self-evidently in error about that proposition, even though we have never before held that such an assessment must be disclosed. In any case, an officer in such circumstances would almost certainly have arrived at that firm credibility view based on *facts* and *information* – which, as explained above, would need to be, and in this case were, disclosed.

9

credible the entirety of Washington's statement, including his exculpatory explanation," Maj. Op. at 36. The majority points to three facts in support of this proposition: (1) that the Officers relied on Washington's testimony in the arrest warrant for Gaston and described him as "prudent and credible," J. App'x at 90; (2) that the Officers arranged for Washington to be placed in witness protection, where he remained for several months without being charged; and (3) that Detective Napolitano allegedly stated to Washington when he was being arrested that "this is not our work," "not what we want," and was "the prosecutor's call," J. App'x at 181–82. But none of these supports an inference that the Officers credited the *entirety* of Washington's statement, including his denials of involvement in the robbery.

Law enforcement officers – like juries, sentencing judges, and "any other factfinder who assesses witness credibility" – are not required to accept the statements of witnesses in an all-or-nothing fashion. *United States v. Norman*, 776 F.3d 67, 78 (2d Cir. 2015) (citation omitted). Clearly, the Officers believed *parts* of Washington's story, much of which was corroborated by other evidence, including the video, glasses, and crime-scene forensic evidence. To that extent, Washington was credible and reliable, and the Officers were justified in describing him as such

10

in the affidavit. But I know of no authority in this Circuit or elsewhere that requires law enforcement officers to adopt the entirety of a witness's statements merely because they determine that portions of such statements are true. *See* J. App'x at 282 (setting forth Napolitano's deposition testimony, in which he said he found "part[s] of [Washington's] statement [not] credible" because he "believe[d] [Washington] was involved in the robbery").

The fact that the Officers arranged to put Washington into witness protection provides even less basis for concluding that they believed his exculpatory statements. As even the most casual observer of the criminal justice system knows, witness protection is full of accomplice witnesses who, like Washington, have legitimate concerns about being retaliated against for cooperating against violent criminals. *See, e.g.*, *Marshall v. Cathel*, 428 F.3d 452, 454 n.3 (3d Cir. 2005) (describing a defendant who pleaded guilty "to conspiracy to commit murder" and then entered into the witness protection program); *United States v. Balsam*, 203 F.3d 72, 81 (1st Cir. 2000); *Jarrett v. United States*, 822 F.2d 1438, 1440 & n.1 (7th Cir. 1987); *United States v. Bufalino*, 683 F.2d 639, 647–48 (2d Cir. 1982). The majority curiously suggests that placement in witness protection somehow supports an inference of innocence, without citing any authority – or

11

even logic – for such a proposition. *Contra Allen v. Woodford*, 395 F.3d 979, 995 (9th Cir. 2005) (characterizing "admission to the witness protection program" as part of a battery of "*impeaching* evidence") (emphasis added). At the risk of stating the obvious, witness protection is designed to keep people safe, not pure, and it is hardly surprising that co-conspirators are among the most conspicuous denizens of the program, since they usually possess the most damning information about the most dangerous targets. *See, e.g.*, *United States v. Persico*, 645 F.3d 85, 96, 113 (2d Cir. 2011) (recounting that Joseph Massino, a former boss of the Bonanno crime family, entered witness protection); Joseph P. Fried, *Ex-Mob Underboss Given Lenient Term for Help as Witness*, N.Y. Times (Sept. 27, 1994) (discussing the imminent witness-protection placement of Sammy "the Bull" Gravano, a former underboss of the Gambino crime family who testified against John Gotti).

Detective Napolitano's alleged statements to Washington at the time of the arrest are equally innocuous and do not remotely suggest that the Officers believed they were arresting an innocent man. Napolitano's acknowledgment that the decision to arrest Washington was "the prosecutor's call" and "not what we want[ed]" at most reflects the Officers' belief that Washington's cooperation merited a non-prosecution agreement. Maj. Op. at 13, 37 (quotation marks

omitted). That's not an unreasonable opinion, and Napolitano would not be the first, or the last, law enforcement officer to hold such a view on behalf of an accomplice witness. But it is certainly a stretch to conclude that statements of this sort, made to an angry witness, raise the specter that the Officers "found Washington's exculpatory statements to be fully credible." Maj. Op. at 41.

Beyond these thin and speculative reeds, the majority can point to no evidence indicating that the Officers "found credible the entirety of Washington's statement, including his exculpatory explanation." Maj. Op. at 36.[3] In fact, the only clear evidence in the record on this point shows the precise opposite, since in signing the affidavit, Napolitano swore to his belief that "probable cause exist[ed] to arrest Laurence Washington" for robbery and felony murder. J. App'x at 95. If the three considerations the majority cites are enough to overcome the Officers' sworn-to contrary belief, then examining an officer's subjective views of various pieces of evidence is likely to become a feature in every wrongful arrest case.

\* \* \*

---

[3] The majority complains that I have improperly examined facts "in isolation," rather than "cumulatively" under the "requisite" totality-of-the-circumstances analysis. Maj. Op. at 38–39. Not so. And the mere invocation of the phrase "the totality of the circumstances" cannot turn a slew of negligible facts into a smoking gun, as the majority would have it do here.

13

Notwithstanding Washington's admissions concerning the details of the robbery and his possession of the victim's property during and after the crime, *see* Conn. Gen. Stat. § 53a-134, the majority holds that Washington has raised a genuine dispute about "whether *any* reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, *could have* determined" that probable cause supported his arrest. *Figueroa*, 825 F.3d at 100. I see no room for such a dispute. At the very least, the record reflects the existence of arguable probable cause, and for that reason I would reverse the decision of the district court and hold the Officers immune from this suit. Accordingly, I respectfully dissent from the Court's contrary decision.